James ROWE, Plaintiff, pro se,

v.

William H. FAUVER, Defendant.

Civ. A. No. 81–3163.

United States District Court,
D. New Jersey.

March 11, 1982.

James Rowe, c/o Marvin Spears, plaintiff, pro se.

Robert A. Shire, Deputy Atty. Gen., of New Jersey, Richard J. Hughes, Trenton, N. J., for defendant.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, James Rowe, sustained a disabling injury while confined at the New Jersey State Prison at Rahway and became partially paralyzed. Pursuant to an admin-

istrative regulation of the New Jersey Department of Corrections, he then became ineligible to earn work credits which could be applied toward the reduction of his sentence. Plaintiff brings this action under 42 U.S.C. § 1983 against William H. Fauver, Commissioner of the New Jersey Department of Corrections, contending that the administrative regulation in question "contravenes" a New Jersey statute, and thereby violates the Due Process Clause of the Fourteenth Amendment. He further contends that the regulation violates the Fourteenth Amendment's Equal Protection Clause.[1]

The matter is before the Court on plaintiff's motion for preliminary injunctive relief and defendant's cross-motion for summary judgment.[2]

### 1. *Background*

Plaintiff alleges that he suffered a serious injury at the New Jersey State Prison at Rahway shortly after his commitment on April 11, 1979, and was successively confined at the Rahway State Prison hospital, the Vroom Readjustment Unit at Trenton State Prison, and the Trenton State Prison hospital. After his injury plaintiff requested assignment to an institutional job which would enable him to earn work credits against his sentence. He claims, however, that he was denied a work assignment pursuant to a Department of Corrections "policy and practice of precluding all prisoners under its care, who are classified as 'medically disabled' from being assigned to any job assignment or receiving any work credit with the exception of those prisoners who were injured while working an institutional job". (Complaint, ¶ 8.)

Defendant Fauver concedes the existence of the policy and practice of which plaintiff complains and states that it is codified as Standard 620.5 of the Department of Corrections' Administrative Plan Manual. Standard 620.5, provides, in relevant part, that:

Inmates shall be paid for actual days worked ... Inmates who are assigned to work but are not available because of physical disability or illness shall receive no pay. Inmates who sustain legitimate injuries in the course of institutional employment must be declared incapacitated for work by the institution's medical department. Inmates so identified shall continue to receive their last normal wage, work credits, or other institutional credits toward their parole or maximum release status, until they are declared ready to return to work by the institution's medical department.

Defendant has submitted an affidavit in which he asserts that:

... the distinction ... whereby inmates who become disabled as a result of their institutional occupation are paid until they are able to return to work and those who become injured or ill as a result of other causes are not paid, is based upon the equitable consideration that in the first case the disability would not have resulted but for the inmate's assignment to an institutional occupation and for his activities in that occupation. (¶ 3)

Defendant Fauver further concedes that it is prison policy to grant work credits to inmates who attend school full-time[3] (¶ 4),

1. Plaintiff also alleges violations of the First, Fourth and Fifth Amendments but has not spelled out any theory of recovery under those amendments.

2. In an opinion dated November 19, 1981 I denied a motion by defendants to dismiss the action, under the doctrine of *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), for failure to exhaust state remedies. Since plaintiff had been released on parole on November 17, 1981, any challenge to the fact or duration of his present confinement was moot. I concluded that *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), was inapplicable because plaintiff's challenge is to the length of his confinement, not to the validity of his conviction. Plaintiff's claims for damages and for remission of time from his overall sentence were not, of course, rendered moot by his release on parole.

The present motion has been considered on the papers, pursuant to Rule 78 of the *Federal Rules of Civil Procedure*.

3. The prison's policy of permitting inmates to earn work credits for school attendance is codified as Department of Corrections Standard 620.6.

and to permit inmates who are restricted to close custody units to earn work credits for "cell sanitation", a task whose "benefits ... to the inmate and to the institution are minimal" (¶ 5). These policies are justified, he asserts, "because it is desirable to encourage inmates to further their education while incarcerated", and because there are few jobs other than "cell sanitation" which can be made available to inmates confined in close custody. Nevertheless, he states, he

> intend[s] to look into the possibility of long term disabled inmates who live in the hospital at Trenton, participating in an educational program or some other productive occupation whereby such individuals can earn work credits and wages. Obviously, any such occupation would have to be consistent with the inmate's health and mental capacity and with the special considerations which pertain to the hospital area of the prison. (¶ 6)

Plaintiff contends that under the New Jersey statute governing the allocation of work assignments and work credits to prison inmates, N.J.S.A. 30:4–92, he had a right to earn work credits regardless of his state of health. N.J.S.A. 30:4–92 provides, in relevant part, that:

> The inmates of all correctional ... institutions within the jurisdiction of the State Board shall be employed in such productive occupations as are consistent with their health, strength and mental capacity and shall receive such compensation therefor as the State Board shall determine.

> Compensation for inmates of correctional institutions may be in the form of cash or remission of time from sentence or both.

As relief, plaintiff seeks a declaratory judgment that the policy of the Department of Corrections violates the Constitution; a preliminary and permanent injunction compelling defendant to award him such work credits as he would otherwise have received but for his period of disability; and damages for "every day that [his] parole eligibility date has been moved back because of not receiving work credits".

Both plaintiff and defendant agree that there are no genuine issues of material fact, and that the matter can be decided as a matter of law.

### 2. Due Process

Plaintiff initially asserts that the prison authorities' refusal to permit him to earn work credits violated the Due Process Clause of the Fourteenth Amendment. In order to evaluate this contention, it is necessary to determine first whether plaintiff had any identifiable "liberty" interest protected under the Due Process Clause, and, if he did have such an interest, whether he was accorded the process due under the Fourteenth Amendment.

■ Plaintiff does not, and could not, claim either an inherent right to earn work credits against his sentence or a right located in the Constitution itself. As the Supreme Court held in *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), "given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." Among the matters the Court has held to be within the discretion of prison administrators as a matter of federal constitutional law, and not within the retained freedom of prison inmates, are the operation of rehabilitative programs, *Moody v. Daggett*, 429 U.S. 78, 88, n.9, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976), and the provision of opportunities for sentence reduction or parole, *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979). It logically follows that a duly convicted and incarcerated prison inmate has no direct federal constitutional right to earn work credits.

Even though plaintiff has no federal right to engage in prison employment or earn work credits he nevertheless asserts that he holds such a right, regardless of the

state of his health, under the New Jersey statute governing prison employment, N.J. S.A. 30:4–92.

It is now well-settled that "liberty" as well as "property" interests entitled to protection under the Due Process Clause of the Fourteenth Amendment may be created by state law. *Wolff v. McDonnell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Winsett v. McGinnes,* 617 F.2d 996, 1005 (3d Cir. 1980). The test for determining the existence of such a state-created liberty is whether the state law creates a "justifiable expectation" that "the liberty will not be infringed except upon the occurrence of specified events". *Helms v. Hewitt,* 655 F.2d 487, 493 (3d Cir. 1981); *see also Vitek v. Jones,* 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980). A state law which confers plenary discretion upon administering officials to grant or deny a benefit creates no justifiable expectation that the benefit will be received at all and hence cannot form the "predicate for invoking the protection of the Fourteenth Amendment". *Meachum v. Fano, supra,* 427 U.S. at 227, 96 S.Ct. at 2539. The mere presence of a discretionary factor in the law, however, will not defeat an individual's claim to a "liberty" interest

if the scope of discretion is bounded by reasonably specific standards. *Winsett v. McGinnes, supra,* at 1006–1007; *cf. Greenholtz, supra; Helms v. Hewitt, supra,* at 497, n.8. Guidance in construing the state law may be obtained not only from the plain language of the statute but also from authoritative interpretations by state courts. *Bishop v. Wood,* 426 U.S. 341, 345–46, 96 S.Ct. 2074, 2077–2078, 48 L.Ed.2d 684 (1976); *see also Greenholtz, supra,* 442 U.S. at 12, 99 S.Ct. at 2106.[4]

Where considerations of health, strength and mental capacity are not involved, the plain meaning of the language employed by the state legislature in N.J.S.A. 30:4–92 might appear to confer a well-defined "liberty" interest in prison employment on inmates. Since it provides that "inmates of all correctional ... institutions ... *shall* be employed" (emphasis added), one would not think that the legislature intended to grant prison administrators discretion to establish or not to establish prison employment programs, or to make employment opportunities available to some and not others.[5]

The New Jersey courts, however, whether rightly or wrongly, have construed the statute otherwise. In *Zink v. Lear,* 28 N.J.Su-

**4.** There is an apparent tension between the Supreme Court's holding, on the one hand, that state-created liberties depend upon the "justifiable expectations" engendered by state laws—a seemingly objective test—and its holding, on the other hand, that state court interpretations control in determining the scope of a state-created right, whether objectively reasonable or not.

In at least one recent case, *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), the Court has held that even though " '[p]roperty interests ... are not created by the Constitution [but] are created and ... defined by existing rules or understandings that stem from an independent source such as state law,' " state legislatures and state courts may not, consistent with the Fifth Amendment, restrict traditionally recognized property rights by arbitrarily or unreasonably redefining the contours of "property", any more than they can unreasonably place affirmative restrictions upon or otherwise "take" acknowledged property rights. It might be argued that the decision indicates that the Court is now willing to recognize—despite its protestations to the contrary—constitutionally

based *property* rights. If so, the question whether state legislatures and courts have plenary authority to define the scope of extra-constitutional liberty and property rights and to alter, amend or reinterpret them at will becomes unsettled. *See Bishop v. Wood, supra,* 426 U.S. at 355–61, 96 S.Ct. at 2082–2085 (White, J. dissenting).

For present purposes, *Bishop v. Wood* and *Greenholtz* still compel the conclusion that a definitive state court interpretation of a state statute, whether or not consistent with the reasonable expectations engendered by the statute's language, controls in defining the scope of a state-created liberty interest.

**5.** On its face, the statute is ambiguous as to whether work opportunities must be provided to inmates who, like plaintiff, are disabled. It could be construed as requiring that *all* inmates must receive work opportunities, the type to be consistent with each inmate's health; or that work opportunities need be provided only to those inmates capable of working. As is explained more fully below, the New Jersey courts have adopted the latter construction.

per. 515, 101 A.2d 72 (App.Div.1953), plaintiff, a prisoner, brought suit complaining that he had not been permitted "to gain the full advantage of work time allowances" under N.J.S.A. 30:4–92. Specifically, he alleged that "although he [was] willing and in fact eager to work, and [had] in the past faithfully discharged such work assignments as [had] been given him", he had lost 114 days of work credits due to time spent ill in the prison hospital, an insufficient availability of prison jobs resulting from overcrowded conditions, national holidays observed by the prison, and illnesses or vacations of supervisory personnel. *Id.* at 519–20, 101 A.2d 72. The Court rejected his claim, holding that:

> The simple answer to this is that there is no authority under R.S. 30:4–92 for granting work time allowance to men who do not work, whether because of illness, unavailable work, vacations or otherwise. *Id.* at 520, 101 A.2d 72.

Implicit in the Court's conclusion that plaintiff was not entitled to work credits for the time in which he had not worked was the unarticulated premise that prison authorities have broad discretion to provide or not provide work opportunities for inmates.[6]

The holding of *Zink v. Lear* was reaffirmed in *Trantino v. Department of Corrections,* 168 N.J.Super. 220, 402 A.2d 947 (App.Div.1979). In *Trantino,* three New Jersey prison inmates who had been denied an opportunity to work or earn work credits while awaiting execution on death row brought an action seeking a retroactive award of work credits following a decision by the New Jersey Supreme Court setting aside the state's death penalty. In its opinion abolishing the death penalty, *State v. Funicello,* 60 N.J. 60, 67–68, 286 A.2d 55 (1972), the state Supreme Court had held that inmates previously sentenced to death

were to be resentenced to "life imprisonment, *nunc pro tunc*" with an entitlement "to the same credits as if initially sentenced to life imprisonment". The Court in *Trantino,* however, rejected plaintiffs' claim for retroactive work credits. Relying upon *Zink v. Lear,* it held that:

> the Supreme Court did not intend [in *Funicello*] to alter, even by implication, the clearly defined legislative policy that the allowance of work credit is based upon actual work performed .... This principle applies even though a prisoner's failure to engage in work may be due to circumstances beyond his control, such as physical infirmity or illness, administrative segregation or unavailability of work. *Id.* 168 N.J.Super. at 224–25, 402 A.2d 947.

As in *Zink v. Lear,* the Court sidestepped the question whether the selective denial of prison work opportunities is authorized by N.J.S.A. 30:4–92, but implicitly held that such decisions lie within the sound discretion of prison authorities.

■ Despite the apparently plain language of N.J.S.A. 30:4–92, therefore, the New Jersey courts have construed the statute to grant considerable discretion to corrections officials in providing or not providing work opportunities even where the health, strength and mental capacity of the inmate are not involved. The state courts have tacitly approved the temporary denial of work opportunities to all inmates for administrative reasons, such as overcrowding or the lack of supervisory personnel, *Zink v. Lear, supra,* and the permanent denial of work opportunities to specific categories of inmates, such as those on death row, for internal policy reasons, *Trantino v. Department of Corrections, supra.* In particular, the state courts have approved the

---

**6.** The state court's analysis in *Zink v. Lear* is, to be sure, elliptical. In holding that N.J.S.A. 30:4 92 does not authorize work credits for inmates who do not work, the Court begged the underlying question whether plaintiff was *unlawfully* denied an opportunity to work in the first instance. Just as a court has inherent authority to award back pay to an unlawfully discharged employee, even though the employ-

ee performed no work after discharge, one would assume that the state courts have inherent authority to remedy an *unlawful* denial of prison work opportunities with a retroactive award of work credits. Hence, it can be inferred that the court in *Zink v. Lear* did not consider the denial to plaintiff of work opportunities unlawful.

denial of work credits to prison inmates who, like plaintiff, are unable to work due to physical illness or disability. Given the existence of such broad discretion under state law, I conclude that plaintiff had no constitutionally protected "liberty" interest in an opportunity to work or receive work credits while incarcerated in the New Jersey prison system.

Even if plaintiff did possess a state-created "liberty" interest in prison employment, I do not believe that he was denied "substantive" due process of law.[7] It does not follow, as plaintiff contends, that *any* regulation, act or practice of a state agency which may be unlawful as a matter of state law necessarily violates the Federal Constitution as well. Substantive due process analysis does not require, without more, a determination whether a regulation or practice is lawful under state law—that is a question for the state courts[8] —but whether the regulation *irrationally* or *arbitrarily* deprives an individual of a state-created right. *Harrah Independent School District v. Martin,* 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979).[9] An administrative regulation may be unlawful under state law for a number of reasons—because, for example, it was not promulgated in accordance with state-mandated notice and comment procedures, *see Motyka v. McCartle,* 58 N.J. 165, 179–80, 276 A.2d 129 (1971); N.J.S.A. 52:14B–4, lies beyond the scope of

an agency's delegated powers, *see In re Weston,* 36 N.J. 258, 263, 176 A.2d 479 (1961), or conflicts with an independent provision of law, *see N.J. Association of Health Care Facilities v. Finley,* 83 N.J. 67, 84–86, 415 A.2d 1147 (1980)—yet not be so lacking in a rational basis as to offend the Due Process Clause of the Constitution. Conversely, a regulation which has been found to be lawful under state law by the state courts may nevertheless be so lacking a rational justification as to violate the Constitution. *See, e.g., Logan v. Zimmerman Brush Co.,* —— U.S. ——, 102 S.Ct. 1148, 71 L.Ed.2d —— (1982).

The distinction observed here is not a new one but has long been a mainstay of Fourteenth Amendment jurisprudence. In *Owensboro Water Works Company v. Owensboro,* 200 U.S. 38, 26 S.Ct. 249, 50 L.Ed. 361 (1906), for example, the Supreme Court unanimously held that:

Many acts done by an agency of a State may be illegal in their character, when tested by the law of the State, and may, on that ground, be assailed and yet they cannot, for that reason alone be impeached as being inconsistent with the due process of law enjoined upon the States. The Fourteenth Amendment was not intended to bring within Federal control everything done by the States or by

7. Plaintiff's claim in this action is founded entirely upon the "substantive" branch of due process analysis. Nowhere in his pleadings does he allege that he was denied adequate procedures in connection with the deprivation of a state-created "liberty" interest.

8. Absent diversity of citizenship between the parties, the existence of a sufficiently substantial federal question to confer pendent jurisdiction, or the incorporation into a federal statute of state standards, federal courts are simply without power under Article III of the Constitution to resolve issues of state law. Even where federal courts have such power, they are prohibited by considerations of comity and the proper balance of federal-state relations from making independent determinations of state law, but must treat state court resolution of state law issues as conclusive. *Murdock v. City of Memphis,* 87 U.S. 590, 22 L.Ed. 429 (1875); *see generally Ad World, Inc. v. Town-*

*ship of Doylestown,* —— F.2d ——, ——, No. 81–1497, slip op. at 13 (3d Cir. Feb. 4, 1982) (Meanor, J., dissenting). For similar reasons the Supreme Court has held that "[n]eedless decisions of state law should be avoided" by federal courts. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Railroad Commission of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In light of these principles, it would be unseemly at best for federal courts to arrogate to themselves, absent some independent federal interest, the function of determining whether the acts, practices, policies or regulations of state officials violate state law.

9. It may well be that the unlawfulness of a regulation or practice under state law may be a consideration in determining if the regulation or practice is rational or arbitrary.

its [sic] instrumentalities that is simply illegal under the state laws, but only such acts by the States or their instrumentalities as are violative of rights secured by the Constitution of the United States. A different view would give the Fourteenth Amendment a far wider scope than was contemplated at the time of its adoption, or than would be consonant with the authority of the several States to regulate and administer the rights of their peoples, in conformity with their own laws, subject always, but only, to the supreme law of the land. *Id.* at 47, 26 S.Ct. at 252. The same view was reiterated three decades later in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), in which the Court held that a state agency's action:

is subject to constitutional infirmity to the same but no greater extent than if the action were taken by the state legislature. Its illegality under the state statute can neither add to nor subtract from its constitutional validity. Mere violation of a state statute does not infringe the federal Constitution. *Id.* at 11, 64 S.Ct. at 402.

In this fashion, the Supreme Court has drawn into sharp focus the distinction between mere state law violations giving rise to a cause of action in the state courts and constitutional violations cognizable in the federal courts.

The viability of the principles set forth in *Owensboro* and *Snowden* has not been undermined by the subsequent "revolution" in due process analysis effected by such cases as *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1974), *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and their progeny. In these cases the Supreme Court has introduced a two-step analysis of the Due Process Clause, inquiring first whether an individual has a legiti-

mate claim to "liberty" or "property" and, second, what process he is due if deprived of such an entitlement.

For purposes of the first inquiry the Court has turned to state law as a potential source of both "liberty" and "property" interests. This approach, which effectively incorporates state law standards into the constitutional definition of "liberty" and "property", requires, in many cases, an extensive analysis of an individual's rights under state law.

For purposes of the second inquiry, however, the Court has never concerned itself with state law. Rather, it has formulated the components of "the process that is due" as a matter of purely federal constitutional law. Thus, in determining the *procedures* required by the Due Process Clause, the Court has deemed irrelevant any procedures appended to a state-created right by state law, looking instead to federal constitutional standards alone. *See Vitek v. Jones,* 445 U.S. 480, 490, n.6, 100 S.Ct. 1254, 1262, 63 L.Ed.2d 552 (1980).[10] By the same token, in measuring the *substantive* limits imposed by the Due Process Clause upon a state's authority to deprive individuals of "liberty" and "property", it has applied a test—one of non-arbitrariness—which finds its source solely in federal law, not in state law. *See Harrah Independent School District v. Martin, supra; cf. Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971); *Flemming v. Nestor,* 363 U.S. 603, 611–12, 80 S.Ct. 1367, 1372–1373, 4 L.Ed.2d 1435 (1960) (applying the Due Process Clause of the Fifth Amendment).

It is fully consistent with modern case law, therefore, to hold that an individual may have a "liberty" or "property" interest by virtue of a state statute, and yet not be deprived of that right in violation of the Due Process Clause simply because a state policy, regulation or action appears to con-

---

10. It is for this reason that I have held that a failure by state officials to follow state procedural regulations not independently required by the Constitution fails to state a claim under the Due Process Clause. *See King v. Hilton,* 525 F.Supp. 1192 (D.N.J.1981); *see also United States v. Jiles,* 658 F.2d 194 (3d Cir. 1981); *cf.*

*Helms v. Hewitt,* 655 F.2d 487, 491 (3d Cir. 1981), where in n.5 the Court stated, "... we do not reach the issue whether a failure of state officials to comply with state procedural regulations constitutes a deprivation of federal procedural due process".

flict with the same or another state statute. While the Due Process Clause draws on state law as a source of substantive rights, it employs an independent federal standard—necessarily a quite lenient one—in determining the limits of a state's authority to take such rights away.[11]

■ For the reasons set forth in the following section of this opinion, I conclude that the regulation plaintiff challenges is neither irrational nor arbitrary but furthers legitimate state ends.[12] As a matter of law, therefore, plaintiff is not entitled to prevail on those claims which are founded upon the Fourteenth Amendment's Due Process Clause. Should plaintiff wish to pursue his claim that the regulation, even though rationally based, nevertheless violates state law, his remedy lies in the state courts.

### 3. Equal Protection

As a second ground for relief, plaintiff asserts that Department of Corrections Standard 620.5, because it denies work credits to disabled inmates while permitting inmates who attend school, perform "cell sanitation" or receive injuries on the job to receive work credits, deprives him of equal protection of the laws, in violation of the Fourteenth Amendment.

Where, as here, a state regulation which neither creates "suspect" or "quasi-suspect" classifications nor impinges upon fundamental rights is challenged on equal protection grounds, the Supreme Court has traditionally applied a "rational basis" test. E.g., Harrah Independent School District v. Martin, supra, 440 U.S. at 199, 99 S.Ct. at 1064. Under this "relatively relaxed" or "minimal scrutiny" standard, legislation is upheld if it "classif[ies] the persons it af-

fects in a manner rationally related to legitimate governmental objectives". Schweiker v. Wilson, 450 U.S. 221, 230–34, 101 S.Ct. 1074, 1080–1082, 67 L.Ed.2d 186 (1981). In the prison context, the scope of federal court review is even narrower, since prison administrators are entitled to a "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security". Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

■ Defendant has articulated a reasoned basis for each of the distinctions made between the class of which plaintiff was a member—inmates suffering from total disability and confined to the prison hospital—and other inmates in the New Jersey prison system. Inmates who are injured on a prison job, he states, are awarded work credits for equitable reasons—as a form of "workers' compensation" designed to recompense them for injuries sustained while furthering the interests of the prison—while inmates who suffer illnesses or injuries not related to prison work have no similar equitable claim for compensation. Recognition of such "equitable" concerns is not irrational and may have the effect of reducing tension in the prison and hostility against prison administrators. The policy of awarding work credits to inmates for school attendance, defendant states, is intended to encourage educational pursuits in the prison. This is a goal corrections officials understandably feel to be desirable and rationally promotes the legitimate in-

---

11. A number of § 1983 suits have been filed in the federal courts in recent months relying upon the theory that violations of state law by state officials constitute ipso facto violations of the Fourteenth Amendment to the Constitution. The confusion appears to have resulted from a misunderstanding of the Supreme Court's injection of state law into the first level of due process analysis. Many erroneously compress the two levels of due process analysis into one, assuming that state law governs the process due as well as the rights protected.

12. Where social legislation which neither creates "suspect" classifications nor burdens fundamental rights is challenged, the standard of review under the Due Process and Equal Protection Clauses is substantially the same. Malmed v. Thornburgh, 621 F.2d 565 (3d Cir. 1980); cf. U.S. Railroad Retirement Board v. Fritz, 449 U.S. 166, 173, n.8, 101 S.Ct. 453, 458, 66 L.Ed.2d 368 (1980).

stitutional aim of rehabilitation.[13]   Finally, the creation of a "cell sanitation" work program for inmates who are restricted to close custody, even if the work is relatively light, promotes the obvious end of boosting morale in an area of the prison posing special security risks, a decision which lies well within the discretion of prison administrators.

It cannot be gainsaid that plaintiff's claim that inmates who have suffered a disability and are unable to work through no fault of their own should be entitled to earn work credits in some fashion is an appealing one.   Defendant has acknowledged as much by stating in his affidavit that he intends to investigate the possibility of providing a special work program for hospitalized inmates.   While the lines between those who are entitled to receive work credits and those who are not may have been drawn differently, however, it cannot be said that they have been drawn in an arbitrary fashion or that the classifications which result are not rationally related to legitimate institutional objectives.

For the foregoing reasons, I conclude that plaintiff is not entitled to prevail, as a matter of law, on those claims which are founded on the Equal Protection Clause of the Fourteenth Amendment.   Defendant, therefore, is entitled to an award of summary judgment on the entire action.   This determination renders moot plaintiff's application for preliminary injunctive relief.

Defendant's attorney is requested to submit a form of order consistent with this opinion.

---

13.   While plaintiff asserts in his complaint and affidavit that he requested and was denied admission to the prison school program, he has not made this alleged denial the basis of an equal protection claim or charged that the criteria for selection to the school program are unreasonable.   The sole issue presently before the Court is whether the prison policy of awarding work credits to inmates who attend school but denying credits to other inmates who do not work violates the constitutional guarantee of equal protection.