James FLOWERS, Plaintiff,

v.

William H. FAUVER, et al.,
Defendants.

Civ. No. 87–3564 (REC).

United States District Court,
D. New Jersey.

Jan. 6, 1988.

James Flowers, pro se.

Barry Fulmer, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

GERRY, Chief Judge.

This is a motion to dismiss, for failure to state a claim, a civil rights action brought *pro se* under 42 U.S.C. § 1983 by plaintiff James Flowers, an inmate at Trenton State Prison. Plaintiff alleges that while on duty at his prison job, he suffered an injury which caused him to be laid-in from his employment. He subsequently ceased receiving compensatory wages, despite provisions in the Inmate Handbook which provided for the payment of such wages when lay-ins occur due to employment-related injuries. This denial of wages, plaintiff asserts, constituted a violation of the due process and equal protection rights accorded him by the Fourteenth Amendment; in addition, plaintiff avers, this lack of pay makes it impossible to purchase toiletries to maintain his personal hygiene and foodstuffs to supplement his diet, deprivations of which constituted cruel and unusual

punishment in violation of the Eighth and Fourteenth Amendments.

Defendants, the Commissioner of the Department of Corrections, other officials and employees of the Department, and Stephen Tasy, a Deputy Attorney General in the New Jersey Division of Law, move to dismiss the complaint upon the all-encompassing ground that prisoners have no constitutional right to work opportunities. For the reasons explained below, this motion will be granted in part and denied in part.

*Factual Background*

Plaintiff's stated cause of action stems from his removal ["lay-in"] from the position of a.m. Food Cart Pusher in the Food Service Program at the Trenton State Prison on January 31, 1986. Plaintiff's work supervisor, Assistant Supervisor of Food Service Kirk Bennett, announced that his dismissal was due to the fact that he was "constantly on medical lay-in" and recommended that he be "refer[ed] to PCC [Prison Classification Committee] for job change." Plaintiff's Ex. "A". Plaintiff contends that the medical lay-ins complained of actually were the result of a work-related injury: prior to his assignment as cart pusher, plaintiff had undergone extensive vascular surgery to his right leg, and in or about December 1985, he had re-injured it while on duty on the food cart detail. According to the uncontested averments in his complaint, plaintiff was examined after this incident by the prison physician, who determined that, due to his history of leg problems, the position of cart pusher was detrimental to plaintiff's health. Consequently, the physician placed plaintiff on indefinite medical lay-off, and recommended to the PCC that he be accorded a job change. Complaint, ¶¶ 12, 13.

The New Jersey Department of Corrections Administrative Plan Manual, Standard 620.5 provides, in part:

Inmates shall be paid for actual days worked ... Inmates who sustain legitimate injuries in the course of institution-al employment must be declared incapacitated for work by the institution's Medical Department. Inmates so identified shall continue to receive their last normal wage, work credits, or other institutional credits toward their parole or maximum release status, until they are declared ready to return to work by the institution's medical department.

Additionally, the Inmate Handbook For State Prison, Trenton (December 1985 ed.) states:

Inmates who have been determined by the Medical Department to be medically handicapped or hospital handicapped are not entitled to institutional wages nor to work credits. The sole exception are those inmates certified by the Medical Department and work assignment supervisor to have been injured during performance of their work assignment.

It is apparently undisputed that after plaintiff was placed upon medical lay-off by the prison physician, he began receiving compensation wages, and continued receiving such payments until June 30, 1986. At that time, again according to the unchallenged allegations of plaintiff's complaint, the Food Service Department "underwent substantial changes in [its] supervisory capacity," and plaintiff's compensatory wage payments ceased. Complaint, ¶ 14.

Plaintiff then commenced a lengthy attempt to recoup his wage payments via institutional administrative remedies. He submitted Administrative Remedy Forms to defendant Howard L. Beyer, Administrator of Trenton State Prison, on at least three occasions—July 15, 1986, September 15, 1986 and January 27, 1987, respectively—complaining that he was not being paid in accordance with the provisions of the Inmate Handbook. Plaintiff supplemented these official complaints with correspondence to other prison officials, including defendant Fauver and defendant Willis Morton, associate administrator at Trenton State Prison, and to inmate Harold Hicks, co-chairman of the Prisoners' Representative Committee,[1] all relating his problems

---

1. Hicks, in turn, related plaintiff's problems to defendant Morton in written correspondence dated May 13, 1987. Hicks Aff., Plf's Ex. "O".

with his lack of wage compensation. On March 23, 1987, plaintiff received his first response to these missives in a letter from defendant Sidney Hicks, Deputy Director of the Division of Adult Institutions, Department of Corrections. Hicks informed plaintiff that he would forward his complaints to defendant Morton, and direct Morton to respond to them promptly. Plf's Ex. "I".

Plaintiff, however, still received no direct response to his claims. He sent more inquiries to defendant Morton on April 10, 1987 and, through the Prison's Representative Committee, on June 15, 1987. On June 23, 1987, plaintiff received a letter from defendant Stephen Tasy, informing him that his complaints were being investigated by the prison authorities. The next day, June 24, 1987, plaintiff finally heard from defendant Morton. In a memorandum letter, Morton stated that his staff had conducted "a full and complete investigation" into plaintiff's situation, which had determined that the medical condition that had occasioned his lay-in "was a pre-existing condition, and was no way caused by, nor did it happen on [plaintiff's] job." Plf's Ex. "L". Therefore, Morton advised plaintiff, "You have no claim to compensation for the period you were laid in." *Id.* This letter was followed by correspondence from defendant Hugh Downing, Acting Executive Assistant at Trenton Prison and defendant Beyer, on July 2 and July 20, 1987, respectively. Both Downing and Beyer advised the plaintiff that as a result of Morton's finding that plaintiff's medical injury pre-dated his work assignment, his claim for compensation was considered closed. Plf's Exs. "M", "N".

On September 1, 1987, plaintiff filed the instant action in this court. He seeks declaratory and compensatory relief for recoupment of back wages, and punitive damages of $5,000 to be assessed against each defendant.

*Legal Analysis*

Defendants advance a single argument against plaintiff's allegations that his denial of compensatory wages violated his rights to due process and equal protection and constituted cruel and unusual punishment: prisoners in New Jersey have no constitutional right to prison work at all, and therefore, can have no federal claim based on a denial of compensatory wages. Defendants are entirely correct that, despite language in the New Jersey statutes which provides that "inmates of all correctional ... institutions ... shall be employed ... and shall receive ... compensation," N.J.S.A. 30:4–92, state and federal courts have held that the statute creates no constitutionally cognizable "right to work" for inmates. *Rowe v. Fauver*, 533 F.Supp. 1239, 1245 (D.N.J.1982); *Zink v. Lear*, 28 N.J.Super. 515, 520, 101 A.2d 72 (App.Div. 1953).

However, the issue of whether plaintiff is entitled to work opportunities is entirely distinct from whether he is entitled to wage compensation when he suffers an alleged work-related injury. In *Ingenito v. Department of Corrections, State of New Jersey*, 568 F.Supp. 946 (D.N.J.1983), this court held that, notwithstanding the fact that prisoners have no inherent or statutorily-created right to work, they do enjoy a statutory entitlement to some form of compensation when they *do* perform work, and that the constitutional guarantee of due process is therefore applicable. 568 F.Supp. at 953. Similarly, the crucial inquiry in this case is whether there exists for New Jersey prisoners a constitutionally-protected expectation to compensatory wage benefits when they are injured on their prison jobs.

■ Taking all of plaintiff's averments as true (which we must do for the purposes of this motion to dismiss) it appears that he underwent surgery on his right leg before he began work on the food cart detail; that he re-injured his leg while on the detail; and that he was then examined by the institutional physician who in or about January 1986 determined that he was incapacitated for such labor and placed him on indefinite medical lay-in. Plaintiff then began receiving compensatory wage payments, and continued receiving them up until June 30, 1986, when they somewhat inexplicably ceased. These allegations,

without more, articulate a viable cause of action sufficient to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure only if we find that plaintiff had a protected liberty or property interest in compensatory wage payments when incapacitated as a result of a work-related accident or injury.

We hold that plaintiff retained such an interest. As noted above, both the Administrative Plan Manual of the New Jersey Department of Corrections and Inmate Handbook promulgated for Trenton State Prison inmates provides that inmates declared incapacitated by the prison medical department due to injuries suffered during the course of their prison employment are entitled to receive their normal means of compensation. In *Winsett v. McGinnes*, 617 F.2d 996 (3d Cir.1980), *cert. denied sub nom., Anderson v. Winsett*, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822 (1981), the Third Circuit ruled that a set of regulations promulgated by the Delaware Department of Corrections to implement a work release program constituted a State-created liberty interest to which constitutional due process rights attached. 617 F.2d 1004–1008. Following *Winsett*, other circuit courts reaching the issue have unanimously agreed that official prison policy statements and regulations can give rise to a liberty interest under the due process clause. *Baumann v. Arizona Department of Corrections*, 754 F.2d 841, 844 (9th Cir.1985) ("Published prison regulations may create a protected interest"); *Lucas v. Hodges*, 730 F.2d 1493, 1502–1504 (D.C.Cir.1984) *vacated as moot*, 738 F.2d 1392 (D.C.Cir.1984) ("a prisoner may acquire a protected liberty interest by virtue of official policy statements or regulations duly promulgated by administrators of the particular institution at which the prisoner is confined.") *Lyon v. Farrier*, 727 F.2d 766 (8th Cir.) (per curiam), *cert. denied* 469 U.S. 839, 105 S.Ct. 140, 83 L.Ed. 2d 79 (1984); *Hayes v. Thompson*, 726 F.2d 1015 (4th Cir.1984); *Dudley v. Stewart*, 724 F.2d 1493 (11th Cir.1984); *Shango v. Jurich*, 681 F.2d 1091 (7th Cir.1982); *Gurule v. Wilson*, 635 F.2d 782 (10th Cir.1980); *Bills v. Henderson*, 631 F.2d 1287 (6th Cir.1980).

Further, the United States Supreme Court, in numerous decisions, has indicated that a state could create a liberty interest by virtue of a prison's administrative rules and regulations.[2] And, in two decisions, *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), the Court has suggested that the sole element necessary for determining when procedural guidelines or policy statements rise to the level of a state-created protected interest is the existence, in the guidelines, of "particularized standards or criteria" which place "substantive limitations on official discretion." *Olim, supra*, 461 U.S. at 249, 103 S.Ct. at 1747; *Hewitt, supra*, 459 U.S. at 471–72, 103 S.Ct. at 871.[3] The Administrative Plan

---

**2.** As the D.C. Circuit observed in *Lucas v. Hodges*, 730 F.2d 1493, 1501–02 (D.C.Cir.1984):

Long before *Hewitt*, the Supreme Court announced often, albeit in dicta, that the state could create a liberty interest not only by statutory restrictions on official discretion but by administrative rules and regulations. *See e.g., Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 466, 101 S.Ct. 2460, 2464, 2465, 69 L.Ed.2d 158 (1981) ("The ground for a constitutional claim must be found in statutes or other rules defining the obligations" of prison authorities; here, "there are no explicit standards by way of statute, regulation or otherwise"); *id.* at 467, 101 S.Ct. at 2465 (Brennan, J. concurring) ("respondents must show—by reference to statute, regulation, administrative practice, contractual arrangements or other mutual understanding —that particularized standards or criteria

guide the State's decisionmakers."); *Vitek v. Jones*, 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980) (approving district court's reliance on "objective expectation, firmly rooted in state law and official Penal Complex practice"); *Montanye v. Haymes*, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976) (referring to absence of regulations governing transfer of prisoners.) *Cf. Meachum v. Fano*, 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976) (state may create procedural rights "whether by statute, by rule or regulation").

**3.** In *Hewitt*, to be sure, the Court expressed some unease over finding that "procedural guidelines [which] channel the decision-making of prison officials" might "open[ ] the door to scrutiny by the federal courts" of the "day-to-day administration of a prison system." 459 U.S. at 470, 471. However, the Court found that

Manual and the Inmate Handbook applicable here clearly and unambiguously provide that inmates who have received verified work-related injuries *must* be accorded compensatory wages or work credits, and admit of no discretion on the part of prison officials to deny such benefits to qualified prisoners.

Accordingly, plaintiff's contention that he was wrongfully deprived of wages after an employment-related accident forced him to go on medical lay-in implicates a state-created liberty interest in compensatory payment for injury incurred during the course of prison labor and therefore states a claim upon which relief may be granted. Defendants' motion to dismiss plaintiff's due process claims under FED. R. CIV. P. 12(b)(6) will be denied.[4]

As to plaintiff's equal protection claim, *i.e.*, that he was denied compensatory wage payments "when other inmates with identical claims are receiving compensatory wages in accords [sic] with said mentioned procedures," defendants assert that this, also, must be dismissed on 12(b)(6) grounds because plaintiff has no right to work opportunities or wages in the first instance and second, because the prison officials' determination that plaintiff's injury was pre-existing was not arbitrary or irrational. We have held, however, that the fact that plaintiff enjoys no right to a prison job in no way diminishes his right to compensatory wages if he is injured while on the job.

Further, whether or not plaintiff's injury was "pre-existing" is perhaps the preeminent factual dispute in this case; we cannot determine, particularly on a motion to dismiss, whether the defendant prison officers' findings in this regard are factually supportable at all, much less whether the actions they took with regard to plaintiff were arbitrary or irrationally inconsistent when compared to treatment meted out to other similarly situated inmates. Therefore, defendants' motion to dismiss plaintiff's equal protection claim must also be denied.

■ Turning finally to plaintiff's claim that deprivation of his prison labor wages constituted cruel and unusual punishment, we must agree with defendants that plaintiff has failed to state a claim. In order to articulate a cause of action under the Eighth Amendment, a prisoner must allege that he has been denied "the minimal civilized measure of life's necessities." *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 999 (3d Cir.1983), *rehearing denied*, 718 F.2d 1247 (3rd Cir), *cert. denied* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984), *quoting Rhodes v. Chapman* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed. 2d 59 (1981). Additional toiletries and supplemental foodstuffs purchased with prison work wages may well make prison life more tolerable, but this plaintiff has made no showing that are a "necessity of life" at Trenton State, or that he has suffered any

---

because the prison guidelines at issue "used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," the regulations "created a protected liberty interest." *Id.* 459 U.S. at 471–72, 103 S.Ct. at 871. Similarly in this case, Standard 620.5 provides that inmates identified as having sustained employment-related injuries *"shall* continue to receive their last normal wage, work credits, or other institutional credits toward their parole or maximum release status, until they are declared ready to return to work by the institution's medical department." New Jersey Department of Corrections Administrative Plan Manual, Standard 620.5 (emphasis added).

**4.** Of course, a holding that plaintiff has a constitutionally protected interest in compensation for prison labor not performed due to work-related injury does not necessarily mean that

plaintiff's due process rights which attach to that interest have been violated. In order to make such a showing, plaintiff must demonstrate that "defendants' actions *irrationally* or *arbitrarily* deprived him of his state-created right." *Ingenito v. Dept. of Corrections, State of New Jersey.*, 568 F.Supp. 946, 953 (D.N.J.1983) *citing Harrah Independent School District v. Martin*, 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) (emphasis in original). On the record before us, it is impossible to determine what motivation, if any, defendants had for terminating plaintiff's wage payments; or what procedure, if any, defendants employed to develop their conclusions with regard to the origin of plaintiff's injury, other than defendant Morton's cryptic assurance that his staff completed a "full and complete investigation" of plaintiff's complaints. Fortunately, for the purposes of this motion, we may leave resolution of this issue to another day.

illness or hardship because he has been unable to purchase them. Accordingly, defendant's motion to dismiss plaintiff's claim alleging cruel and unusual punishment will be granted.

An appropriate order has been prepared and entered.