SHANGO (Cleve Heidelberg, Jr.),
Plaintiff-Appellee,

v.

Mary JURICH, et al., Defendants,

Gayle Franzen, former Director of the Illinois Department of Corrections, and Richard DeRobertis, Warden of the Stateville Correctional Center, Defendants-Appellants.

Nos. 81–2175, 81–3079.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 10, 1982.

Decided June 23, 1982.*

Rehearing Denied Aug. 10, 1982.

---

* Pursuant to Circuit Rule 16(e), this opinion has been circulated among all judges of this court in regular active service because it repudiates certain statements made in prior opinions of this court. See note 14, *infra*. No judge favored a rehearing *en banc* on this issue.

Karen Konieczny, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants.

George J. Casson, Jr., Bell, Boyd, & Lloyd, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and BONSAL,** Senior District Judge.

ESCHBACH, Circuit Judge.

In this case Illinois prison officials appeal from two preliminary injunctions entered by the district court. Plaintiff, an Illinois state prisoner, claimed that prison officials had unlawfully transferred him from Stateville Correctional Center (Stateville) to Menard Correctional Center (Menard). Plaintiff also alleged that certain of his personal effects, which had been packed for transport, were never returned to him. Contending that the intrastate prison transfer and the failure to return his property constituted violations of his rights under the Fourteenth Amendment, he sought preliminary injunctive relief. The district court granted such relief, ordering Illinois prison officials to transfer plaintiff back to Stateville and to return his personal effects. Plaintiff was then transferred to Stateville, but his property was not returned to him. His stay in Stateville lasted but a few months; prison officials once again transferred him to Menard. Plaintiff contended that his transfer back to Menard warranted a contempt citation. The district court held that prison officials did not violate the preliminary injunction by transferring plaintiff back to Menard, but issued a second preliminary injunction ordering the officials to

** The Honorable Dudley B. Bonsal, Senior District Judge of the United States District Court for the Southern District of New York, sitting by designation.

return plaintiff to Stateville once again. Our jurisdiction to review the preliminary injunctions is founded upon 28 U.S.C. § 1292(a)(1). For the reasons which follow, we hold that the issuance of these preliminary injunctions constituted an abuse of discretion and therefore reverse.

## I

Plaintiff Cleve Heidelberg, Jr., known as "Shango" in the prison community,[1] is serving a long-term sentence in the Illinois correctional system. During his incarceration at Stateville, which began in 1970, he was active as a "jailhouse lawyer" and aided fellow inmates in a variety of legal proceedings.

In the summer of 1980, another inmate charged that Shango had sexually assaulted him. The details of this charge, and the ensuing disciplinary proceedings, are tangentially germane to the issues raised in this appeal in only two respects: first, Shango claimed that the prison officials used the charge as a mere pretext for harassing him for his legal work; and, second, Shango was committed to segregation for a period of one year commencing on July 14, 1980.[2]

While Shango was exhausting his administrative remedies concerning his commitment to segregation on the sexual assault charge, a prison investigator in August 1980 confronted Shango with an allegation that Shango was in some way involved with weapons inside the prison. Although there was a conflict in the testimony concerning the precise nature of Shango's alleged contact with weapons, Shango professed igno-

rance regarding the charge. The investigator asked Shango to submit to a polygraph examination concerning the subject of weapons in the prison, but Shango refused, stating that if he knew anything about the subject he had acquired the information through his legal assistance to other inmates and would regard such information as confidential and privileged against disclosure. Stateville's warden, defendant Richard DeRobertis, who testified that he had received information in the spring of 1980 that Shango was a member of an organized group of prisoners which manufactured homemade weapons, discussed his concern about the subject with Shango in September 1980. Shango claimed that DeRobertis was pressing for what Shango considered to be privileged information and that DeRobertis attempted to induce his cooperation through promises of leniency. According to DeRobertis, Shango stated that it would be impossible for DeRobertis to prove that Shango was involved in the manufacturing of weapons, quoting Shango as saying, "To know is one thing; to show is another."[3]

Warden DeRobertis ostensibly concluded that Shango was a threat to safety at Stateville because of his involvement with a weapons ring and decided that the transfer of Shango to another correctional facility was the appropriate response to the perceived threat. Consequently, DeRobertis recommended Shango's transfer and, after his transfer request was approved, Shango was transferred to Menard on October 30, 1980. Shango was not given a hearing con-

---

1. We shall refer to plaintiff as Shango in this opinion since he brings this action in that name and the district court's opinions referred to him by that name.

2. The district court held that the disciplinary proceedings resulting in Shango's placement in segregation did not accord Shango due process and therefore ordered defendants to remove him from segregation and restore forfeited good time. Defendants do not appeal that portion of the district court's preliminary injunction order and we therefore do not address the subject.

3. The district court did not make a specific finding as to whether such a statement was actually made. Nor did it make such findings with respect to other testimony; instead, it often merely stated that a certain individual testified to certain events. While Fed.R.Civ.P. 52 requires findings of fact only respecting facts which constitute the grounds for granting or denying interlocutory injunctions, our task on appeal is complicated when the district court recites testimony without making a finding regarding the testimony.

cerning the transfer before his move.[4] When he was informed of his imminent move to Menard, Shango packed his personal effects into four cartons. Among the items contained in the cartons were law books, legal papers, personal writings, and political material. All of the cartons were transported to Menard, where officials retained custody of them purportedly for the purpose of inspecting their contents. Three of the boxes, containing legal materials and other personal effects such as clothing, were never returned to Shango. The interprison transfer of Shango did not affect his one year commitment to segregation; upon arrival at Menard, he was confined in a segregation unit as he had been in Stateville.[5]

## II

On November 19, 1980 Shango filed a *pro se* motion for a temporary restraining order in the U.S. District Court for the Northern District of Illinois seeking relief pertaining to his transfer and his confinement in segregation. The court denied the motion but appointed counsel to represent Shango regarding his claims.[6] Shango alleged that prison officials had placed him in segregation and had transferred him to Menard because he had refused to reveal information confided to him in connection with his legal assistance to other inmates, asserting a violation of his Fourteenth Amendment due process rights. He also alleged that the disciplinary proceedings on the homosexual assault charge were constitutionally deficient and that the seizure of his personal effects and the conditions of his confinement at Menard constituted violations of the Eighth Amendment's prohibition of cruel and unusual punishment. Plaintiff filed a motion for a preliminary injunction on December 31, 1980, seeking, *inter alia*, an order directing prison officials to transfer him back to Stateville, place him in nonsegregation status there, restore good time credit, and return his personal effects to him. After a two day evidentiary hearing and the filing of post-hearing briefs, the court granted such a preliminary injunction in a Memorandum of Opinion and Order entered July 13, 1981. 521 F.Supp. 1196.

The district court held that plaintiff had not sustained his burden of demonstrating a likelihood of success on his principal claim that his confinement in segregation and transfer to Menard were the result of his refusal to reveal putatively confidential information to prison officials. Nevertheless, the court found the disciplinary proceedings resulting in his confinement in segregation violative of due process on procedural grounds and ordered a cessation of such confinement and a restoration of good time. Similarly, the court found a procedural due process violation regarding Shango's transfer to Menard. Proceeding on "the basis that Warden DeRobertis had a good faith belief that Shango posed a threat to the safety of Stateville," *id.* at 1202, the court held that administrative regulations of the Illinois Department of Corrections were not followed by prison officials with respect to Shango's transfer. The court interpreted these regulations to require a hearing prior to an inmate's interprison transfer, viewing the requirement as vesting a personal right to such a hearing in a prisoner recommended for transfer.[7] The court reasoned

---

4. However, in the hearing conducted by the district court on February 11, 1981 on the motion for a preliminary injunction, Shango testified on direct examination that he was provided with a hearing on his November 17, 1980 grievance filed with Menard prison officials in which he challenged the transfer. Tr. at 231–34.

5. While his status was the same, it appears that the conditions at the Menard segregation unit may have been inferior to those at Stateville, although Shango also complained about the conditions of his cell at Stateville.

6. Shango filed the motion in a consolidated cause, No. 74–C–3598, then pending before the district court in which various aspects of the Stateville law library system were being challenged. Counsel filed a supplemental complaint, docketed under the same cause number, setting forth Shango's claims under 42 U.S.C. § 1983.

7. Though the court indicated that the transfer was disciplinary, it did not limit its holding to transfers which could be characterized as disciplinary.

that the existence of the regulations created a justifiable expectation on the part of inmates that no transfer would occur without a hearing. This expectation, the court held, constitutes a liberty interest protected by the Fourteenth Amendment's due process clause. Because Shango was transferred without a hearing, the court concluded that he had been deprived of liberty without due process of law. Moreover, the court viewed the prison official's failure to provide him with a hearing as a *per se* violation of the Fourteenth Amendment's equal protection clause. These legal conclusions convinced the court that Shango had demonstrated "substantially more" than a likelihood of success on the merits of his claim. *Id.* at 1204. It also found the conditions of Shango's confinement at Menard "appalling" and indicated that such conditions constituted irreparable harm, but did not address the merits of plaintiff's Eighth Amendment argument. *Id.* at 1200, 1204. Finally, having found unconstitutional actions on the part of state officials and violations of plaintiff's due process rights, the court believed that "the injury to Shango must by definition outweigh any harm" that might be caused to defendants in granting the relief sought and stated that it is a "contradiction in terms to say that vindicating due process rights" could disserve the public interest. *Id.* at 1204.

Having thus applied the standards for imposing preliminary injunctive relief, the court ordered defendants to transfer Shango to Stateville. Given that the district court characterized Shango's due process right as coterminous with the perceived state created right to remain in a particular prison until a hearing was held concerning a recommended transfer, it is perhaps not surprising that the court viewed the only possible remedy for this situation as a transfer back to Stateville; the court did not consider, in its opinion at least, the

possibility of merely ordering the state officials to provide Shango that which they had denied him—an opportunity to state his reasons for opposing the transfer.[8] It did, however, anticipate the possibility of prison officials conducting such a hearing upon Shango's return to Stateville, and stated the following concerning such a development:

> This Court expresses no opinion as to whether a determination could properly now be made, if the requirements of due process were scrupulously adhered to, that the safety of Stateville requires Shango's transfer. At this point the alleged information on which the original decision was made is even more stale, and any proposed new proceeding would of course have to be scrutinized with care to make sure it was not really retaliatory for either Shango's having brought this action or Shango's jailhouse lawyering or both.

*Id.* at 1204 n.11.

Regarding plaintiff's personal effects, in spite of the fact that the district court stated that "[i]t appears highly likely that the material may have been lost or destroyed," *id.* at 1201, the court ordered defendants to return the personal property.

Defendants transferred Shango to Stateville in August 1981 where he was placed in non-segregation status; his property was not returned to him. Within weeks, Warden DeRobertis instituted proceedings to send Shango back to Menard. At his request the Stateville Institutional Assignment Committee met with Shango. Shango was told the reason for the transfer—the warden's opinion that such a transfer was in the best interests of the institution and in Shango's best interest—and Shango objected to the transfer. The committee approved of the transfer by a 2–1 majority.

---

**8.** Indeed, Shango had already been provided with an administrative post-transfer hearing in which he voiced his objections to the transfer. See note 4, *supra.* The district court evidently thought that it was unnecessary to mention the post-transfer hearing conducted approximately a month after the transfer in light of its analy-

sis of the effect of state prison regulations. It did note, however, that Administrative Regulation 820 required a post-transfer hearing within ten days of an emergency transfer, and that no such hearing was held. In any event, it held that Shango's transfer could not be considered an emergency. See 521 F.Supp. at 1203.

Shango was sent back to Menard on November 6, 1981.

Plaintiff filed a *pro se* petition for an order directing defendants to show cause why they should not be held in contempt of the district court's preliminary injunction. Once again, court appointed counsel interceded on Shango's behalf. The court did not enter a show cause order nor did it hold an evidentiary hearing. Instead, in a Memorandum Opinion and Order entered December 8, 1981, relying upon documentary material, the court held that defendants were not in contempt of its order. It then proceeded to scrutinize the documentary record of the transfer proceedings. Noting that DeRobertis' recommendation for the transfer was based upon his review of Shango's entire institutional record and behavior and noting a report relied upon in seeking the transfer was a summary of Shango's disciplinary record, the district court stated: "There can be no question that the transfer was indeed 'disciplinary.' " Since in the district court's view a disciplinary interprison transfer had to be preceded by a hearing, the court proceeded to analyze whether Shango's appearance before the Institutional Transfer Committee fulfilled that requirement. Describing both the reasons for the transfer and the hearing as "Kafkaesque," the court found the proceedings "totally lacking in notice and a meaningful opportunity to be heard" and indicated that the asserted grounds for the transfer were too vague to be refuted by Shango and too stale to form the basis of a valid interprison transfer. Without holding an evidentiary hearing and without applying the standards applicable to the granting of preliminary injunctive relief, the district court ordered defendants to transfer Shan-

go from Menard to Stateville once again. In addition, in response to an allegation by Shango that his conditions at Stateville (during his brief stay there) were different than they had been before he was placed in segregation, the court also ordered that Shango's conditions of confinement had to be the same as the *status quo ante*.[9]

Defendants appeal from both preliminary injunctions entered by the district court. In No. 81–2175, they maintain that the district court's order directing the transfer of Shango to Stateville and mandating the return of his personal property constituted an abuse of discretion, arguing that prison regulations neither required a hearing nor gave rise to a liberty interest under the Fourteenth Amendment.[10] They do not appeal from the district court's decision concerning Shango's placement in segregation. In No. 81–3079, defendants again argue that a hearing was unnecessary to effectuate the transfer and further argue that if a hearing was necessary, Shango's appearance before the transfer committee was sufficient. They do not appeal from that portion of the district court's order concerning Shango's conditions of confinement. Shango has not been transferred back to Stateville; he remains at Menard.[11]

## III

### A

This court will reverse the grant of a preliminary injunction "if the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–2568, 45 L.Ed.2d 648 (1975). In order to be awarded preliminary injunctive relief, a plaintiff

---

9. Although the court literally ordered that Shango be confined in the same status as he was in immediately prior to his first transfer to Menard, it is plain that the court did not intend such a result since Shango was in segregation immediately prior to the first transfer and the court had ordered him removed from segregation. In any event, his segregation term had expired.

10. No one contends that this appeal is moot due to Shango's transfer back to Stateville since the court's holdings in issuing the first injunction constitute the law of the case and since Shango was transferred back to Menard, where he remains despite the court's second injunction.

11. Defendants filed a motion in this court to stay the second transfer order. The motion is now moot.

"must establish a reasonable probability of success on the merits, irreparable injury, the lack of serious adverse effects on others, and sufficient public interest." *Kolz v. Board of Education*, 576 F.2d 747, 748 (7th Cir. 1978). The issuance of a preliminary injunction must be guided by sound legal principles and a preliminary injunction predicated on a clear mistake of law merits reversal. *See Charles v. Carey*, 627 F.2d 772, 776 (7th Cir. 1980). *See also Douglas v. Beneficial Finance Co. of Anchorage*, 469 F.2d 453, 454 (9th Cir. 1972) ("[W]hen [the] grant or denial [of a preliminary injunction] is based upon an erroneous legal premise; the order is then reviewable as is any other conclusion of law."); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717 (5th Cir. 1982); *City of South Pasadena v. Goldschmidt*, 637 F.2d 677, 678 (9th Cir. 1981). *Compare Ekanem v. Health & Hospital Corp. of Marion County*, 589 F.2d 316, 319 (7th Cir. 1978) (per curiam) with *Menominee Rubber Co. v. Gould, Inc.*, 657 F.2d 164, 166 (7th Cir. 1981). *See generally Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 & n. 18 (2d Cir. 1979) (Judge Friendly cogently discusses the inconsistent and confusing formulations of the abuse of discretion standard applicable to appellate review of interlocutory injunctions.) Moreover, the nature of the relief granted affects our review: "mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued." *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978) (per curiam) (footnote omitted).

### B

·Illinois prison officials want Shango imprisoned at Menard. Shango would prefer to be incarcerated at Stateville. Shango has been transferred from Stateville to Menard twice in the recent past, but in the district court's view neither of these transfers comported with the requirements of the Fourteenth Amendment.

■ The Fourteenth Amendment prohibits a state from depriving a person of life, liberty, or property without due process of law. In order to ascertain whether state action affecting an individual is violative of this prohibition, two inquiries are made: first, a life, liberty, or property interest within the meaning of the clause must be identified; and, second, the degree of process due to the individual before he can be deprived of that interest must be ascertained. *Compare Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) *with Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ The former inquiry may, of necessity in certain cases, require an examination of state law. Property interests, for example, "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents v. Roth, supra*, 408 U.S. at 577, 92 S.Ct. at 2709. Indeed, state law is the primary source of property rights in our federal system. Liberty interests, on the other hand, may either originate in the Constitution or be created by state law. When state law is a possible source of a liberty interest, the analysis concerning its identification as a constitutionally protected interest "parallels the accepted due process analysis as to property." *Wolff v. McDonnell, supra*, 418 U.S. at 557, 94 S.Ct. at 2975. This analysis involves a search for mutually explicit understandings that support an individual's "legitimate claim of entitlement" to a benefit. *Board of Regents v. Roth, supra*, 408 U.S. at 577, 92 S.Ct. at 2709. The parallel between the property and liberty interest analyses, however, is not unwavering, and in some settings it is inappropriate strictly to apply a property interest analysis, which is guided by principles of contract law, to the task of determining the existence of constitutionally protected liberty interests. *See Jago v. Van Curen*, 454 U.S. 14, 17–23, 102 S.Ct. 31, 34–36, 70 L.Ed.2d 13 (1981) (per curiam).

■ Although the existence of a liberty or property interest may be ascertained by reference to state law, once such an interest is identified, the task of defining

the procedural protections which attach to that interest is wholly a matter of federal constitutional law and is accomplished through application of the balancing analysis of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See, e.g., United States Labor Party v. Oremus*, 619 F.2d 683, 689 (7th Cir. 1980). *See generally Arnett v. Kennedy*, 416 U.S. 134, 164, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 15 (1974) (Powell, J., concurring), 177, 94 S.Ct. at 1655 (White, J., concurring and dissenting in part), 206, 94 S.Ct. at 1669 (Marshall, J., dissenting). To be sure, state procedural protections are not ignored. Rather, once it is determined what process is due to the individual before he can be deprived of the specific liberty or property interest by the state, state procedures are scrutinized to see if they comport with the federal procedural due process requirements. However, state procedural protections cannot define what process is due. The Fourteenth Amendment's limitation on state action would be illusory indeed if state practices were synonymous with due process.[12]

 A state prison inmate has no liberty interest, originating in the Constitution of the United States, in remaining in a particular penitentiary. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). The due process clause, in and of itself, does not "protect a duly convicted prisoner against transfer from one institution to another within the state prison system." *Id.* at 225, 96 S.Ct. at 2538. Consequently, the Constitution does not mandate a nationwide rule requiring certain procedural formalities, such as a hearing, prior to such a transfer. *Id.* at 229, 96 S.Ct. at 2540. This is true even in the case of disciplinary transfers: [13] the due process clause, in and of itself, "does not require hearings in connection with [intrastate interprison] transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). "Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections so long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Meachum v. Fano, supra*, 427 U.S. at 228, 96 S.Ct. at 2540.

 Under these principles it is plain that Shango had no liberty interest originating in the Constitution which would trigger the procedural protections of the Fourteenth Amendment.[14] The district

---

**12.** Under some circumstances, however, a state created interest may be viewed as being qualified by limited procedural protections. *See Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (plurality opinion).

**13.** There are substantive limitations on the power of state officials to transfer an inmate from one institution to another. For example, state officials may not transfer an inmate to punish him for his exercise of his fundamental constitutional rights. *See Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). *See generally McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979). State actors are prohibited from taking such action, of course, even if they provide the inmate with a hearing. *See Montanye v. Haymes*, 427 U.S. 236, 244, 96 S.Ct. 2543, 2548, 49 L.Ed.2d 466 (1976) (Stevens, J., dissenting). The observance of procedural formalities cannot render valid an infringement upon inalienable constitutional rights. Thus, it is not at all incongruous to maintain that the Constitution places limita-

tions on the reasons for an interprison transfer but does not require prison officials to conduct a hearing prior to a transfer. When a prisoner believes he has been transferred for an impermissible purpose, the forum for adjudicating that claim is a court of law. Indeed, Shango raised claims below which arguably implicate such an impermissible reason for his transfer, but the district court held that he had not established a reasonable likelihood of success on those claims. We naturally express no view on the merits of those claims in the present posture of this case.

**14.** It is plain from *Montanye* that the characterization of a transfer as disciplinary does not give rise to a liberty interest rooted in the Constitution. Moreover, the fact that Shango was placed in segregation upon his arrival at Menard is irrelevant to the issue of his interprison transfer for two reasons. First, his placement in segregation had nothing to do with his interprison transfer, but was merely a continuation of his previous status at Stateville.

court recognized as much, but purported to identify a liberty interest originating in state law. Specifically, it held that Department of Corrections regulations created such a liberty interest. We disagree.

The Supreme Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980). There is at least some conflict in authority, however, concerning the constitutional significance of non-statutory sources of such interests. *Compare Gorham v. Hutto,* 667 F.2d 1146 (4th Cir. 1981) (state prison policy guidelines insufficient basis for affording liberty interest) *with Walker v. Hughes,* 558 F.2d 1247, 1255 (6th Cir. 1977) (prison policy statements can create liberty interest). We reject the view that state administrative pronouncements are in some juridical sense so inferior to statutory or judicial sources of legal rules that they are not worthy of constitutional recognition. Indeed, the Supreme Court in *Meachum v. Fano, supra,* 427 U.S. at 229, 96 S.Ct. at 2540, indicated that administrative

regulations could spawn a due process liberty interest. After some arguable conflict in our cases, *compare Solomon v. Benson,* 563 F.2d 339, 342–43 (7th Cir. 1977) *with Durso v. Rowe,* 579 F.2d 1365, 1369 (7th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), we concluded that nonstatutory sources could create liberty interests. *Arsberry v. Sielaff,* 586 F.2d 37, 46–47 (7th Cir. 1978). It is therefore sufficient to observe in the context of this case that duly promulgated prison regulations may give rise to such an interest. By doing so, we do not imply that any official pronouncement of prison officials can spawn a protectable right. *Cf. Jago v. Van Curen, supra,* 454 U.S. at 17, 102 S.Ct. at 33 (official notification of grant of parole did not create liberty interest.)

The dispositive issue in this case is not the source of the purported liberty interest, but rather, " 'the *nature* of the interest at stake.' " *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979) (quoting *Board of Regents v. Roth, supra,* 408 U.S. at 571, 92 S.Ct. at 2705

Second, the due process clause, by its own force, does not require a hearing prior to an interprison transfer simply because it is accompanied by or results in segregation. For reasons partially explained in our decision in *Arsberry v. Sielaff,* 586 F.2d 37, 45–46 (7th Cir. 1978), and for reasons which we shall now explain, the case of *Aikens v. Lash,* 547 F.2d 372 (7th Cir. 1976) and its progeny do not establish authority for the proposition that a hearing is constitutionally required prior to a disciplinary interprison transfer if it results in segregation. In a footnote in *Aikens, id.* at 373 n.1, the court noted that the state prison officials had *conceded* that neither *Meachum* nor *Montanye* precluded a requirement of a hearing prior to interprison transfers if the transfer resulted in disciplinary confinement or segregation. Unfortunately, the footnote in *Aikens* spawned a footnote in *Durso v. Rowe,* 579 F.2d 1365, 1369 n.1 (7th Cir. 1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), which unequivocally stated that "[w]here [interprison] transfers are accompanied by . . . disciplinary action [such as segregated confinement], due process applies." This dictum in *Durso* clearly suggested that procedural due process protections applied to such interprison transfers without reference to state law. The footnote in *Durso,* spawned by the footnote in

*Aikens,* itself yielded a conclusory textual statement in *Chavis v. Rowe,* 643 F.2d 1281, 1290 (7th Cir.), *cert. denied sub nom., Boles v. Chavis,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981). In the process of remanding to permit the amendment of a complaint, the *Chavis* court succinctly stated if the plaintiff prisoner (who was not given a transfer hearing) "can establish that his [interprison] transfer was disciplinary, he has stated a valid claim." The court cited only the footnote in *Durso* as authority. Thus was spawned a statement in direct conflict with *Montanye*: the concession in *Aikens* was improvidently viewed as authority in *Durso,* and the unqualified dictum in *Durso* was expanded in *Chavis* to mean that the due process clause itself requires a hearing prior to an interprison transfer. Moreover, there is no doubt that *Chavis* was purporting to rest its conclusion that disciplinary transfers require hearings solely upon the due process clause itself. The very state regulation at issue in this case, in an earlier incarnation, had just been rejected by the court as a possible source of a liberty interest. Furthermore, the citation to *Durso* as the sole authority for the proposition permits no other conclusion. The statement in *Chavis* is plainly irreconcilable with *Montanye* and must of course be disregarded.

(emphasis in *Roth*)). In *Chavis v. Rowe*, 643 F.2d 1281, 1290 (7th Cir.), *cert. denied sub nom., Boles v. Chavis*, 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981), we analyzed the effect of Illinois Department of Corrections A.R. 819, relied upon by the court below, and explicitly held that the Illinois regulations "establish procedures for the exercise of discretion, *but they do not limit the decision to transfer to any particular reason. Without such a limitation, the regulations do not recognize any right on the part of the prisoner to serve in a particular institution.*" (emphasis added). That holding disposed of Shango's claim that the Illinois regulations, standing alone, created a liberty interest triggering procedural due process protections under the analysis of *Meachum v. Fano.*[15] If prison officials are accorded discretion under state law[16] to transfer a prisoner for whatever reason or for no reason at all, the procedural protections of the due process clause cannot attach, quite simply, because there is no substantive liberty interest at stake. The existence of such discretion "preclude[s] the implication of a liberty interest deserving of due process protection." *Anthony v. Wilkinson*, 637 F.2d 1130, 1141 (7th Cir. 1980), *vacated on other grounds mem. sub nom., Hawaii v. Mederios*, 453 U.S. 902, 101 S.Ct. 3135, 69 L.Ed.2d 989 (1981) (remanded for further consideration in light of *Howe v. Smith*, 452 U.S. 473, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981)).

█ The argument that the procedures established by the regulations can themselves be considered a liberty interest is analytically indefensible. We have repeatedly observed: "Procedural protections or the lack thereof do not determine whether a property right exists." *Suckle v. Madison General Hospital*, 499 F.2d 1364, 1366 (7th Cir. 1974). *See Endicott v. Huddleston*, 644 F.2d 1208, 1214 (7th Cir. 1980); *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 3 (7th Cir. 1974); *Adams v. Walker*, 492 F.2d 1003, 1006 (7th Cir. 1974). *Accord, Amezquita v. Hernandez-Colon*, 518 F.2d 8, 13 (1st Cir. 1975), *cert. denied*, 424 U.S. 916, 96 S.Ct. 1117, 47 L.Ed.2d 321 (1976). *See generally Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). This principle is just as applicable, indeed perhaps more so, to an analysis of liberty interests in light of the *Meachum* approach of " 'equat[ing] the threshold test for the finding of a liberty interest with that for determining whether a property interest exists.' " *Arsberry v. Sielaff*, 586 F.2d 37, 46 (7th Cir. 1978) (citation omitted).[17] A liberty interest is of course a

---

**15.** While the regulation has been modified somewhat since the incarnation of it analyzed in *Chavis* (and reprinted in *Stringer v. Rowe*, 616 F.2d 993, App. 1005 (7th Cir. 1980)), the changes do not alter our conclusion that the Illinois prison regulations, including A.R. 820 and A.R. 1000, do not limit the discretion of prison officials regarding interprison transfers. As we explained in *Chavis*, the regulations merely create mechanisms to be utilized by prison officials in effecting transfers; they simply do not speak to the issue of the scope of official discretion concerning the decision to transfer an individual prisoner. It is true that the regulations contemplate different procedures with respect to different types of transfers, but they do not limit the transfer decision to any particular reason.

**16.** No one contends that the applicable statute, Ill.Rev.Stat. Ch. 38, § 1003–8–4 (1973) in any way limits the discretion of prison officials; instead, they may transfer a prisoner for any reason or for no reason at all. Although the parties have not cited any Illinois authority with respect to the prison transfer issue, we

nevertheless considered the following cases to assist us in analyzing the issue: *People ex rel. Willis v. Department of Corrections*, 51 Ill.2d 382, 282 N.E.2d 716 (1972); *People ex rel. Forsythe v. Niersheimer*, 396 Ill. 193, 71 N.E.2d 62, *cert. denied*, 330 U.S. 841, 67 S.Ct. 981, 91 L.Ed. 1287 (1947); *People ex rel. Ross v. Ragen*, 392 Ill. 465, 64 N.E.2d 862 (1946); *People v. Wheeler*, 392 Ill. 455, 64 N.E.2d 865 (1946); *People ex rel. Lowe v. Ragen*, 387 Ill. 131, 55 N.E.2d 83 (1944); *People ex rel. Kerner v. McKinley*, 371 Ill. 190, 20 N.E.2d 498 (1939); *People ex rel. Fullenwider v. Jenkins*, 322 Ill. 33, 152 N.E. 549 (1926); *Taylor v. Franzen*, 93 Ill.App.3d 758, 48 Ill.Dec. 840, 417 N.E.2d 242 (1981).

**17.** In light of *Jago v. Van Curen, supra,* 454 U.S. at 17-22, 102 S.Ct. at 34–36, which indicates a less expansive approach to the identification of liberty interests is appropriate in the prison setting than would be the case if the usual *Roth* inquiry were utilized, it would be especially inappropriate to find that a Fourteenth Amendment liberty interest had sprung from procedural prison regulations.

substantive interest of an individual; it cannot be the right to demand needless formality. In order to establish such an interest, a "plaintiff must show a substantive restriction on the [official's] discretion . . . ." *Suckle v. Madison General Hospital, supra,* 499 F.2d at 1366. Even if Illinois regulations provide a right to a hearing prior to interprison transfers, that procedural right is not accorded federal due process protection. Indeed, plaintiff's argument that the existence of a liberty interest springs from the regulations is not only inconsistent with our holding in *Chavis,* but is refuted by *Meachum* itself. In *Meachum,* the court of appeals interpreted applicable regulations as entitling inmates to a hearing, *see Fano v. Meachum,* 520 F.2d 374, 379–80 (1st Cir. 1975), *rev'd,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), but that "did not deter the Supreme Court from concluding that, on the record before it, state law created no liberty interest." *Lombardo v. Meachum,* 548 F.2d 13, 15 (1st Cir. 1977). Of course the existence of state procedural protections is not irrelevant to a determination of whether a substantive interest exists. A state often provides for specific procedures to ensure the realization of a parent substantive right. *See generally Hughes v. Rowe,* 449 U.S. 5, 15, 101 S.Ct. 173, 179, 66 L.Ed.2d 163 (White, J., concurring). The existence of such protections may suggest the presence of a substantive limitation on official action, *Suckle v. Madison General Hospital, supra,* 499 F.2d at 1366, and it is "not inconceivable that substantive protections could be *inferred from* the existence of procedural safeguards . . . ," *Lombardo v. Meachum, supra,* 548 F.2d at 16 (emphasis added); *compare Yusuf Asad Madyun v. Thompson,* 657 F.2d 868, 873 (7th Cir. 1981); but a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment, *Lombardo v. Meachum, supra,* 548 F.2d at 15–16; *Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir. 1979); *Bills v. Henderson,* 631 F.2d 1287, 1298–99 (6th Cir. 1980). *Contra, Wakinekona v. Olim,* 664 F.2d 708 (9th Cir. 1981) (2–1 decision).

Constitutionalizing every state procedural right would stand any due process analysis on its head. Instead of identifying the substantive interest at stake and then ascertaining what process is due to the individual before he can be deprived of that interest, the process is viewed as a substantive end in itself. The purpose of a procedural safeguard, however, is the protection of a substantive interest to which the individual has a legitimate claim of entitlement. A basic problem, in terms of cogent federal constitutional analysis, with maintaining that one has an entitlement to a state created procedural device such as a hearing is that the dimensions of the procedural protections which attach to state law entitlements are defined by federal standards. When the federal standard is applied, the "process that is due in a given instance may bear little or no resemblance to the original expectation . . . ." *Bills v. Henderson, supra,* 631 F.2d at 1298. Indeed, the logical flaw in the proposition is even more fundamental. If a right to a hearing is a liberty interest, and if due process accords the right to a hearing, then one has interpreted the Fourteenth Amendment to mean that the state may not deprive a person of a hearing without providing him with a hearing. *Reductio ad absurdum.*

A twisted interpretation of the Fourteenth Amendment is advanced by plaintiff in this case in an attempt to avoid the clear holding of *Meachum.* Under the Supreme Court's analysis, a state prisoner may be transferred from one prison in a state to another arbitrarily—for no reason at all"— so long as state law does not place a substantive limitation on the prison officials' exercise of discretion. It is hardly surprising, therefore, that the procedural protections of the Fourteenth Amendment are inapplicable to such a transfer since the fundamental purpose of the due process clause is to shield the individual from arbitrary action. If officials may transfer a prisoner to another prison irrespective of what the inmate may establish at an administrative hearing, the Fourteenth Amendment does not demand that the state en-

gage in a ritualistic hearing. *See Amezquita v. Hernandez-Colon, supra,* 518 F.2d at 13. States may decide to engage in such proceedings, but the due process clause does not compel them to do so because no constitutionally cognizable substantive interest of the prisoner is at stake. In constitutional contemplation, the intrastate interprison transfer of a state prisoner is merely a change of cells; the prisoner has no constitutionally cognizable entitlement to be located in a particular cell within a prison or at a certain location in the state—his freedom in that regard having been extinguished by his conviction—unless the state confers upon him such a substantive right. It can confer such a right either explicitly, by providing in the convict's sentence a right to be incarcerated at a particular institution, or implicitly, by conditioning an inmate's transfer to another prison on the finding of certain specified behavior such as misconduct.

Even in the absence of such conditions being imposed, interprison transfers obviously are not "mindless events;" rather, "[t]ransfers between institutions ... are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate." *Meachum v. Fano, supra,* 427 U.S. at 226, 228, 96 S.Ct. at 2539, 2540. Such a predictive "decision turns on a 'discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done.'" *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, supra,* 442 U.S. at 10, 99 S.Ct. at 2105 (citation omitted). Such discretionary decisions are the business of penologists and "are not the business of federal judges." *Meachum v. Fano, supra,* 427 U.S. at 229, 96 S.Ct. at 2540.

The mandatory preliminary injunctions issued by the district court were predicated on an erroneous interpretation of the governing doctrine and their issuance constituted an abuse of discretion. Once the district court found what it believed to be a violation of a constitutional right, its weighing of the factors to be considered in granting an injunction was overridden by its concern for vindicating the perceived wrong. Moreover, the district court's decision to enter the second injunction constituted an even greater abuse of discretion. The possible procedural deficiencies of the court's approach in entering that mandatory order aside,[18] the court imposed upon state officials a burden to demonstrate the wisdom of their decision to transfer Shango to Menard, a burden imposed neither by the Constitution nor state law. Moreover, the district court invited, indeed all but preordained, the character of the hearing conducted by state officials prior to Shango's second transfer. The district court, in language which clearly implied its views on the subject of a future transfer of Shango back to Menard, indicated that it would view unfavorably another transfer on the ground originally asserted by prison officials—Shango's alleged involvement with a weapons ring and the threat it posed to prison security. Thus being unable to rely upon that ground for the second transfer, the prison officials were left with one option if they wanted to transfer Shango: they had to state their reasons in exceedingly conclusory terms. Of course prison officials maintained that a hearing was unnecessary prior to such a transfer, but in light of the pending litigation, they evidently[19] thought it prudent to provide Shango with an opportunity to state his reasons for opposing the transfer, even though they presumably had an accurate idea of the nature of his objections after the two day hearing conducted

18. Defendants do not challenge the issuance of the injunction on procedural grounds, and the record provides some support for concluding that they may have tacitly acquiesced in the approach taken by the district court. Under these circumstances, we express no view as to the possible procedural questions.

19. A memorandum prepared in connection with the second transfer reveals that the prison officials decided to provide Shango with a hearing due to the pending litigation. This portion of the memorandum is quoted in the district court's unpublished order.

by the district court. The transfer proceeding was indeed Kafkaesque: Shango could say nothing to refute the charge, for there was no charge against him. Prison authorities were attempting to rely upon their power to transfer him for no reason at all.[20] The nature of the hearing with which Shango was provided is a vivid illustration of the reason why the due process clause does not require a hearing where there is no limitation on official discretion.

Nothing we have said, of course, is intended to express any view on the actual reason prison officials decided to transfer Shango. As we have noted, a prisoner cannot be transferred for an impermissible purpose, and if Shango could establish that his transfers were retaliatory for his exercise of a constitutional right, another case would present itself.

### C

The district court also rested its decisions on the Fourteenth Amendment's equal protection clause. Its analysis of the equal protection clause issue consists of the naked conclusion that defendants' failure to provide plaintiff with his asserted state right to a hearing constitutes a violation of equal protection, citing our decision in *Stringer v. Rowe*, 616 F.2d 993, 998 (7th Cir. 1980).

In *Stringer* we were reviewing a grant of summary judgment in which the district court had dismissed a *pro se* plaintiff's claims on the ground he had failed to state a claim upon which relief could be granted. Liberally construing the allegations of the *pro se* complaint, *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), we were applying the well accepted standard that a *pro se* plaintiff's civil rights complaint may only be dismissed if it is beyond doubt that there is no set of facts under which he could obtain relief. In that context we held that plaintiff's allegations that he was transferred from one prison to another without a hearing *and* that his transfer had been approved to hide errors of prison officials were sufficient to survive a summary dismissal. It is a far cry from that holding to the granting of a mandatory preliminary injunction on the mere fact that a particular individual was transferred from one prison to another without the hearing which state law purportedly required. *Stringer* did not portend any change in equal protection analysis.

With the exception of rights recognized in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and its progeny, the guarantee of equal protection of the laws is not a source of substantive rights, "but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McCrae*, 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). "It is not the province of [federal courts] to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 34, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16 (1973). Yet in effect, this is what the district court accomplished. By providing plaintiff with the relief he sought on equal protection grounds, the court granted plaintiff the right to remain in Stateville until prison officials could convince the district court a transfer was warranted, a substantive right which neither the Constitution nor state law affords.

**20.** Of course transfers are not mindless events, and the reason asserted by prison officials was that based on Shango's entire record, a transfer was in the best interest of all concerned. The district judge viewed this as a disciplinary transfer since Shango's record—or at least one document relied upon in connection with the transfer—consisted of a summary of his violations of prison rules. A distinction exists, however, between what is essentially a predictive decision based on assessment of a prisoner's entire institutional record and a decision in response to a specific rule infraction. *Bills v. Henderson, supra*, 631 F.2d at 1296. However, in the context of interprison transfers where official discretion is not limited and the prisoner may be transferred for any reason, even in the latter case the due process clause does not require a hearing prior to transfer.

Shango's transfer without a hearing, in and of itself, cannot be viewed as a denial of the equal protection clause even if it is assumed that he had a state created right to such a hearing. "[N]ot every denial of a right conferred by state law involves a denial of the equal protection of the laws...." *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). *See also Paul v. Davis*, 424 U.S. 693, 699–700, 96 S.Ct. 1155, 1159–1160, 47 L.Ed.2d 405 (1976). Rather, the "Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action." *Brisco v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970). A plaintiff "must demonstrate intentional or purposeful discrimination" to show an equal protection violation. *Bloomenthal v. Lavelle*, 614 F.2d 1139, 1141 (7th Cir. 1980) (per curiam). "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeny*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). It implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group. *See id.* An administrative decision which misinterprets or distorts a valid state law can result in a denial of equal protection *if* there is such a design or intent to discriminate. *See Kendrick v. Walder*, 527 F.2d 44, 47 n.3 (7th Cir. 1975).

In the instant case, Illinois prison officials purport to base their refusal to provide Shango with a transfer hearing on a distinction in the regulations between administrative transfers and disciplinary transfers. Even if Shango's transfer could be regarded as disciplinary, however, the fact that state officials erroneously viewed it as administrative does not by itself establish an equal protection clause violation:

[W]here ... official action purports to be in conformity to [a] statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws.

The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Snowden v. Hughes, supra*, 321 U.S. at 8, 64 S.Ct. at 401. Contrary to the approach taken by the district court in this case, "isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause." *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980). At most plaintiff demonstrated "a mere inconsistency in prison management [which] may not in itself constitute a cognizable equal protection claim." *Durso v. Rowe*, 579 F.2d 1365, 1372 (7th Cir. 1978). In the context of this case, plaintiff had to do more than establish a reasonable probability that he was the victim of an erroneous decision; he had to establish a reasonable likelihood that state officials had purposefully and intentionally discriminated against him in denying him the hearing. The only allegations of the plaintiff which even suggested such disparate treatment concerned his activities as a jailhouse lawyer. The district court, however, explicitly held that plaintiff had *not* established a reasonable likelihood of success on those claims.

The issuance of the injunctions on equal protection grounds thus clearly constituted an abuse of discretion. The grants of the injunctions were predicated on the erroneous conclusion that a denial of a state right is a *per se* violation of equal protection and the court's balancing of the other factors to be considered in the issuance of a preliminary injunction was more illusory than real

once it had erroneously perceived the violation of plaintiff's constitutional rights.[21]

### D

■ The last issue raised in this appeal concerns the lower court's decision to issue a preliminary injunction ordering defendants to return Shango's personal effects taken from him in connection with his first transfer. While plaintiff argued that some of the effects were in some respects unique, he failed to establish irreparable harm sufficient for invoking preliminary injunctive relief. Moreover, in light of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), plaintiff failed to establish a reasonable likelihood of success in establishing a federal claim, and the district court failed to make any factual finding which would establish a ground for its issuance of the interlocutory injunction, see Fed.R. Civ.P. 52(a).[22] Lastly, we observe that the district court's finding that it was "highly likely" that plaintiff's personal effects could no longer be produced by defendants hardly supported the issuance of a preliminary injunction compelling them to do so. Equity does not engage in idle gestures.

### IV

Accordingly, the orders appealed from are hereby reversed with respect to the issues raised in this appeal; the preliminary injunctions against defendants ordering them to return plaintiff to Stateville and return his personal effects are hereby dissolved. The case is hereby remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

---

**21.** We express no view on the possibility that Shango may be able to continue to assert whatever rights he may possess under Illinois prison regulations as pendent state law claims. Such a determination is properly made in the first instance by the district court applying the analysis of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and the decision to assume jurisdiction over a pendent state law claim rests in the sound discretion of the district court.

**22.** "Under *Parratt*, negligent deprivations for which prisoners may be compensated by state tort claim procedures do not violate federal due process guarantees." *Yusuf Asad Madyun v. Thompson, supra*, 657 F.2d at 873. Plaintiff maintains that the unexplained disappearance of his property constituted a violation of due process. In doing so, he mistakenly assumes that the burden of proof is upon defendants to establish that the failure to return his possessions was due to negligence. The burden, of course, is upon the party seeking preliminary relief to establish a reasonable probability of success on his claim. While plaintiff apparently maintains that the failure to return his personal effects was part of a systematic effort on the part of prison officials to interfere with his jailhouse lawyer activities, the district court did not find plaintiff had established a likelihood of success on his harassment claims.