William JACKSON, Plaintiff,

v.

ILLINOIS DEPARTMENT OF CORREC-
TIONS, et al., Defendants.

No. 82 C 2490.

United States District Court,
N.D. Illinois, E.D.

July 1, 1983.

Burton S. Odelson, Mark Sterk, Odelson & Associates, Evergreen Park, Ill., for plaintiff.

Neil F. Hartigan, Atty. Gen. of Ill., John J. Curry, Jr., Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

William Jackson ("Jackson") sues the Illinois Department of Corrections ("Department") and six of its officials[1] under 42 U.S.C. § 1983 ("Section 1983"), alleging he was deprived of due process of law[2] when, without a hearing before or after the decision, he was barred from receiving visits from his friend Sharon Sue Spencer ("Spencer") at Stateville.[3] Defendants have moved to dismiss for failure to state a claim upon which relief may be granted. For the reasons stated in this memorandum opinion and order defendants' motion is denied.

---

1. Stateville Correctional Center ("Stateville") Warden Richard DeRobertis ("DeRobertis"); Stateville Assistant Warden Michael O'Leary ("O'Leary"); Chairman of Stateville's Institutional Inquiry Board ("Stateville's Board") Mel Allen ("Allen"); Stateville Internal Affairs investigator Price ("Price") and correctional officer Mathis ("Mathis"); and Chief of Department's Prisoner Advocacy Services Marvin Manar ("Manar").

2. Jackson's "First Amended Complaint" (the "Complaint") ¶¶ 24 and 26 also make passing reference to the Equal Protection Clause, but the Complaint is utterly devoid of factual allegations relevant to an equal protection claim.

3. Jackson originally filed this action pro se, but this Court appointed Burton S. Odelson, Esq. and Mark H. Sterk, Esq. to act as his counsel. This Court expresses its gratitude to them for taking on this pro bono matter.

*Facts* [4]

As a Stateville inmate, Jackson had been receiving visits from Spencer for about a year. About January 24, 1982 [5] Mathis told Jackson that for a $20 payment Mathis would arrange that a visit take place outside the designated visiting area. On January 24 Spencer visited Jackson, and Mathis escorted her to a room outside the designated area. Correctional officer Lt. Rodriguez observed Mathis doing so and later reported the incident.

On January 26 O'Leary issued a Stop Order (the "Order," Complaint Ex. A) barring Spencer from visiting Jackson. In addition to identifying Spencer and Jackson the Order said:

> Rationale for Stop: Inappropriate Conduct
>
> This Stop Order will remain in effect until further notice.

On January 29 Jackson petitioned (Complaint Ex. B) for a grievance hearing before Stateville's Board to challenge the Order. Stateville's Board has taken no action on Jackson's petition.

Jackson then sought review of his grievance before Department's Administrative Review Board ("Department's Board"). On March 8 Department Director Michael Lane wrote Jackson (Complaint Ex. C), informing him Department's Board would not consider his grievance petition until the matter had been processed by Stateville's Board.

Jackson then talked to Manar, who advised Jackson to write O'Leary and tell him Spencer's going to the private room was occasioned by a sudden illness. Jackson also spoke to DeRobertis about Stateville Board's failure to hear his grievance. De-

Robertis told Jackson he was awaiting Jackson's lie detector test. Jackson took that test March 30 but was repeatedly told by Allen the results were unavailable. Jackson received the results in June and tendered them to Allen, who promised Jackson a hearing. None has been held.

Jackson asserts three Fourteenth Amendment due process violations:

1. O'Leary's issuance of the Order without a hearing;

2. O'Leary's failure to advise Jackson of the basis for the Order; and

3. defendants' [6] failure to investigate and conduct a hearing on Jackson's resulting grievance.

Defendants argue (Motion ¶ 2) (1) Jackson has no property or liberty interest in his visitation privileges and (2) suspension of those privileges does not require observance of any "special" procedural guaranties.

*Liberty Interests and Due Process*

Jackson's Section 1983 action implicates the familiar teaching reiterated by our Court of Appeals in *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982):

> The Fourteenth Amendment prohibits a state from depriving a person of life, liberty, or property without due process of law. In order to ascertain whether state action affecting an individual is violative of this prohibition, two inquiries are made: first, a life, liberty, or property interest within the meaning of the clause must be identified; and, second, the degree of process due to the individual before he can be deprived of that interest must be ascertained.

But the second inquiry is not relevant at this stage of this action, for Jackson alleges

---

**4.** This recitation implies no *findings* of fact. Rather, the Complaint has been given the assumptions due it on a Fed.R.Civ.P. ("Rule") 12(b)(6) motion (*Mathers Fund, Inc. v. Colwell Co.,* 564 F.2d 780, 783 (7th Cir.1977)):

> [O]n a motion to dismiss, a complaint must be construed in the light most favorable to the plaintiff, the allegations thereof being taken as true; and, if it appears reasonably

conceivable that at trial the plaintiff can establish a set of facts entitling him to some relief, the complaint should not be dismissed.

**5.** All subsequent dates without year designations were also in 1982.

**6.** That is, all individual defendants except Mathis.

he was afforded *no* process at all and that is conceded at least for purposes of defendants' motion.[7] Thus if Jackson's allegations (taken as true) show he has an implicated liberty interest[8] the Complaint must stand, and Jackson becomes entitled to the opportunity to prove he is entitled to relief because defendants deprived him of that interest without due process of law.

Defendants' motion may be focused more narrowly in another regard too. As the Supreme Court recently repeated in *Hewitt v. Helms*, —— U.S. ——, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983):

> Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States.

Brief analysis confirms Jackson invokes the latter, not the former. He does not assert the Due Process Clause confers any substantive visitation rights upon him.[9] Indeed his general "visitation rights" are not really in issue—the Order bars only Spencer, and Jackson's Complaint attacks only the Order and the alleged procedural defaults surrounding it. Without minimizing Jackson's friendship with Spencer, it can hardly be said his attachment to her rises to the level of a basic constitutional liberty interest or the Order inflicted a "grievous loss" beyond the ramifications of his incarceration. *See id.* 103 S.Ct. at 869–70.

Jackson relies rather (Ans. Mem. 1–2) on a liberty interest he says was created by Illinois law. Jackson contends he was deprived of that interest by defendants' disciplinary action against him.[10] That brings a rather complex area into play.

■ Just two months ago, in *Olim v. Wakinekona*, —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) the Supreme Court surveyed its prior decisions on state-created liberty interests and concluded (*id.* 103 S.Ct. at 1747, citations omitted):

> These cases demonstrate that a State creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particularized standards or criteria guide the State's decisionmakers." . . . If the decisionmaker is not "required to base its decisions on objective and defined criteria," but instead "can deny the requested relief for any constitutionally permissible reason or for no reason at all," . . . the State has not created a constitutionally protected liberty interest.

In *Olim* itself the Court found Hawaii prison regulations on transfer of prisoners placed no substantive limitations on official discretion and thus created no liberty interest. *Id.* 103 S.Ct. at 1747–48.[11]

But *Olim, id.* 103 S.Ct. at 1748 n. 10, distinguished *Hewitt*, where the Court found Pennsylvania *had* created a protected liberty interest in its laws and regulations on placing prisoners in administrative segregation (*id.* 103 S.Ct. at 871, citation omitted):

---

**7.** Indeed Motion ¶ 2 seems so vigorous in its assertion no process was due Jackson that defendants may well be really admitting (not merely conceding *arguendo*) no process was afforded him.

**8.** Clearly the Complaint raises a liberty rather than a property interest claim.

**9.** Case law leaves uncertain whether prisoners have a constitutional right to have visitors. *See Brisbon v. Lane*, 554 F.Supp. 426, 428 (N.D. Ill.1983) and authorities cited there. Of course incarceration itself entails a restriction on inmates' rights to associate with those outside the institution. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977).

**10.** Contrary to the implications of Ans. Mem. 2–3 the fact there may have been a disciplinary purpose behind the Order does not automatically mean a liberty interest is involved. Under the law that controls this Court, a due process claim arises only if the discipline imposed impinges *on* a liberty interest or a fundamental right. *See Shango*, 681 F.2d at 1098–99 nn. 13–14.

**11.** In that respect the Court relied on the Hawaii Supreme Court's own interpretation of Hawaii law. *Olim*, 103 S.Ct. at 1747, 1748 n. 10.

Nonetheless, in this case the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed ... and that administrative segregation will not occur absent specified substantive predicates—*viz.*, "the need for control," or "the threat of a serious disturbance." Petitioner argues, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

Thus *Olim* and *Hewitt* combine to emphasize the necessity for close scrutiny of the state laws or regulations asserted as creating a liberty interest.

*Olim* and *Hewitt* are paralleled by the holdings of our Court of Appeals in *Shango* and *Johnson v. Brelje,* 701 F.2d 1201 (7th Cir.1983). In *Shango* (681 F.2d at 1100–02) the Court found Illinois prisoner regulations governing inmate transfers did not create a liberty interest because those regulations did not limit an official decision to transfer to any particular reason, thus leaving official discretion unfettered. But in *Johnson* (701 F.2d at 1205) the same Court found an Illinois statute created a liberty interest by specifying a recipient of mental health services—including a criminal defendant found unfit to stand trial and placed in the custody of mental health officials—"shall be provided with adequate and humane care and services *in the least restrictive environ-*

*ment*" (emphasis in original, quoting Ill. Rev.Stat. ch. 91½, § 2–102). As in *Hewitt,* the *Johnson* statutory language was mandatory and was tied to substantive requirements.

So the question is whether Jackson's situation better fits the *Hewitt-Johnson* mold or that of *Olim* and *Shango.* Jackson's counsel invoke principally (Ans. Mem. 1–2) Ill.Rev.Stat. ch. 38, § 1003–8–8(a) ("Section 8(a)"):

> The Director shall establish procedures to review the grievances of committed persons. The Director may establish one or more administrative review boards within the Department to review grievances. A committed person's right to file grievances shall not be restricted. Such procedure shall provide for the review of grievances by a person or persons other than the person or persons directly responsible for the conditions or actions against which the grievance is made.

First, that section focuses on Jackson's claims arising *after* the Order was issued and thus seems irrelevant to his claim as to initial issuance of the Order without a hearing. But more importantly Section 8(a), despite its mandatory language, sets out only procedural requirements with nothing substantive attached save possibly the right to *file* a grievance, which is not in issue here. Although as an original matter it might seem logical a state-created procedural scheme can (or absent evidence of a contrary intention does) create an entitlement to rely on that scheme, both the Supreme Court and our Court of Appeals have decisively rejected the notion state procedural guaranties themselves create substantive federal rights—or liberty interests—protected by the Fourteenth Amendment and Section 1983. *Olim,* 103 S.Ct. at 1748; *Hewitt, id.* 103 S.Ct. at 871; *Shango,* 681 F.2d at 1100–01.[12]

12. This Court cannot but observe again the irony—if not indeed inherent implausibility—of that position. After all, it rests on the notion prison officials would deliberately set up a complex structure and superstructure of hearings simply for the sake of show: to enable them to go through the motions (but only if they want to) to reach a result they could come

But Jackson has zeroed in on the wrong part of Illinois' Unified Code of Corrections. Section 8(a) deals with "Grievances," while the preceding section (Ill.Rev.Stat. ch. 38, § 1003–8–7, "Section 7") deals with "Disciplinary Procedures." And part of that section, Section 7(b)(2), provides:

> Disciplinary restrictions on visitations, work, education or program assignments, and the use of the prison's library shall be related as closely as practicable to abuse of such privileges or facilities. This paragraph shall not apply to segregation or isolation of persons for purposes of institutional control.

By its terms Section 7(b)(2) leaves official discretion unfettered as to disciplinary restrictions on visitation (and other privileges) when related to "segregation or isolation of persons for purposes of institutional control." But Section 7(b)(2) mandates other disciplinary restrictions on visitation "shall be related as closely as practicable to abuse

of such privileges or facilities." Both by its literal language and by the necessary implication from the excepted "institutional control" situation, the statute clearly confines official discretion by requiring the punishment reasonably to fit the crime. Section 7(b)(2) plainly means an official can act improperly (for example) by restricting an inmate's visitation privileges more severely than the facts dictate.[13]

■ Therefore Section 7(b)(2) confers on Jackson a state-created liberty interest (akin to that given constitutional protection in *Hewitt*) in preserving his visiting privileges against imposition of excessive restraint. At least at this threshold level of the case, he must be viewed as possibly able to prove that interest was deprived without due process when (1) Spencer was barred by the Order without a hearing[14] and (2) defendants failed to hear his grievance seeking review of the Order, or both. Jackson

to *without* a hearing because they are unrestrained by either facts or standards. That is of course possible, though a cruel deception:

1. Practical prison administration may indeed perceive the need for cosmetic devices like apparent but unreal "hearings," if only to provide another safety valve for the pressures the volatile prison environment creates.

2. To give the administrators more credit, they may perhaps want to accord prisoners the reasoned decisions that hearings presumably promote, even though no *right* to such decisions exists (although on this score the input this Court receives in the form of prisoner complaints gives no great comfort—at least as to some of the administrative personnel who are applying, as distinct from structuring, the regulations).

Parenthetically it might be noted that, given the nature of the prison grapevine and the proliferation of jailhouse lawyers, measures viewed as purely cosmetic could well be counterproductive to the goal of peaceful prison administration. But to return to the main issue, at the very least the mere creation of a hearing structure ought to generate serious judicial doubts that those administering it are intended to be free to rule wholly without standards—or to put it differently standards should at least be presumed absent clear evidence to the contrary. It will be recalled the *Olim* majority found such clear evidence in the Hawaii Supreme Court's declaration of Hawaii law—and

it criticized the dissenters' non-acceptance of that reading (103 S.Ct. at 1748 n. 10). Without such evidence, the very inauguration of a hearing system ought itself be read to imply a state law determination that administrative discretion is bounded by standards. In any event, the Illinois statutes involved here do create *Hewitt*-type standards.

13. That in turn must mean there is a substantive basis for *review* of a visitation discipline decision in a Section 8(a) grievance procedure, as Ill.Rev.Stat. ch. 38, § 1003–8–7(c) directs (footnote omitted):

> Review of disciplinary action imposed under this Section shall be provided by means of the grievance procedure under Section 3–8–8. A written report of the infraction shall be filed with the chief administrative officer within 72 hours of the occurrence of the infraction or the discovery of it and such report shall be placed in the file of the institution or facility. No disciplinary proceeding shall be commenced more than 8 calendar days after the infraction or the discovery of it unless the committed person is unable or unavailable for any reason to participate in the disciplinary proceeding.

14. On this Rule 12(b)(6) motion there is no room to consider whether exigent circumstances may have prevented a hearing before issuance of the Order.

need show no more to survive defendants' motion to dismiss. *See Hewitt,* 103 S.Ct. at 870 & n. 5.

### Conclusion

Defendants' motion to dismiss is denied. Defendants are ordered to answer the Complaint on or before July 11, 1983.

