Johnny SMITH, Plaintiff,

v.

J.W. FAIRMAN, Warden, Defendant.

No. 82–2013.

United States District Court,
C.D. Illinois,
Danville Division.

Dec. 30, 1982.

**446**

Johnny Smith, pro se.

Michael T. Mullen, Asst. Atty. Gen., Chicago, Ill., for defendant.

## ORDER DENYING SUMMARY JUDGMENT FOR DEFENDANT

BAKER, District Judge.

The plaintiff is an inmate at Pontiac Correctional Center. In his complaint under 42 U.S.C. § 1983 the plaintiff alleges that the defendant, the warden, violated the plaintiff's right of privacy and his right to due process of law by allowing him to be filmed in his cell without his consent. On June 25, 1982, in a short written order, the court denied the defendant's motion for summary judgment and indicated that an expanded written order would follow. This is that order.

The defendant sought summary judgment against the plaintiff on the two issues raised in the complaint. First, the plaintiff claims his right of privacy was violated when the defendant led a television camera crew to the plaintiff's locked cell, identified the plaintiff to the crew, and authorized the crew to film the plaintiff despite his protests. Second, the plaintiff claims that his right to due process of law was violated by the defendant's failure to comply with Administrative Regulation (A.R.) 011 II C, which requires that an inmate give his consent before photographing or interviewing of the inmate will be permitted.

The court will grant a motion for summary judgment only when the pleadings and the evidentiary materials reveal that no genuine issue of any material fact remains and that summary judgment is appropriate as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment bears the burden of establishing the absence of any dispute as to a material fact, and any doubt will be resolved in favor of the non-moving party. *Rose v. Bridgeport Brass Co.*, 487 F.2d 804, 808 (7th Cir.1973).

## I. THE RIGHT OF PRIVACY ISSUE.

The defendant contends in support of his motion that as a matter of law he did not violate the plaintiff's constitutional right of privacy. In support of that contention, the defendant argues that since the plaintiff's image did not appear on the television broadcast, no violation of the plaintiff's right of privacy could have occurred. The defendant also asserts that the plaintiff has no cognizable constitutional right not to be filmed, and that if such a right exists, it

was violated by the camera crew rather than by the defendant.

Taking the plaintiff's allegations as true, the defendant not only authorized the crew to film the plaintiff, but also led the crew to the plaintiff's cell and identified the plaintiff to the crew. The court concludes that the plaintiff has alleged sufficient facts to state a claim against Warden Fairman. It is necessary, therefore, to discuss whether the defendant's arguments about the fact that the plaintiff's picture was not published on television and about the absence of a right not to be filed have any merit.

The United States Supreme Court has found the constitutional right of privacy to emanate from various constitutional amendments, including the first, fourth, fifth, ninth and fourteenth amendments. *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). In the present case, it is apparent that factual questions remain concerning the violation of the plaintiff's right of privacy, whether that privacy right originated in the fourth or the fourteenth amendment.

A. *Fourth Amendment.*

The fourth amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Although the filming of the plaintiff by a television camera crew is not a recognized "search and seizure," electronic surveillance, photographing and electronic recording have been considered searches and seizures and have received a fourth amendment analysis from the courts. *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1977); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Lanza v. New York,* 370 U.S. 139, 142, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962) ("This Court through the years has not taken a literal or mechanical approach to the question of what may constitute a search or seizure." (footnote omitted)).

Whether the fourth amendment prohibition against unreasonable searches and seizures affords the plaintiff protection against being filmed presents an issue of first impression. Two cases decided by the United States Supreme Court indicate that prisoners enjoyed very limited, if any, fourth amendment protection. *Lanza v. New York,* 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919).

In *Lanza,* the petitioner had visited his brother, who was confined in a New York jail. The jail officials electronically intercepted and recorded a conversation between the petitioner and his brother. In dicta, the Court indicated that no fourth amendment violation had occurred, stating:

> But to say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument . . . . [W]ithout attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.

370 U.S. at 142–43, 82 S.Ct. at 1220–21. These comments on the fourth amendment are dicta and appear in an opinion in which only four members of the Court joined. Further, Chief Justice Warren, Justice Brennan and Justice Douglas protested the Court's "gratuitous exposition (That) the constitutional protections against invasions of privacy do not operate for the benefit of persons—whether inmates or visitors—inside a jail . . . ." *Id.* at 150, 82 S.Ct. at 1224 (memorandum opinion of Justice Brennan).

In more recent decisions the focus of fourth amendment analysis has shifted from considering whether a constitutionally protected area is involved to determining whether violations of a reasonable or legitimate expectation of privacy. *Bell v. Wolfish,* 441 U.S. 520, 556–59, 99 S.Ct. 1861, 1883–84, 60 L.Ed.2d 447 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct.

330, 332, 54 L.Ed.2d 331 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 545–47, 555–56, 94 S.Ct. 2963, 2969–70, 2974–75, 41 L.Ed.2d 935 (1974); *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967). As the Court in *Katz* stated:

> [T]he Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection .... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351–52, 88 S.Ct. at 511–12 (citations omitted).

Moreover, in recent years, the Court has recognized that "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). "Inmates in jails, prison, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however 'educational' the process may be for others." *Houchins v. KQED, Inc.,* 438 U.S. 1, 5 n. 2, 98 S.Ct. 2588, 2592 n. 2, 57 L.Ed.2d 553 (1977) (dicta).

But the Supreme Court has refrained from holding that prisoners possess any fourth amendment rights. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Bell* presented the Court with two issues of privacy. First, the Court considered whether unannounced searches of inmate living areas infringed the detainee's interest in privacy. In upholding the random room searches, Justice Rehnquist, writing for the majority, observed:

> It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person .... Assuming, *arguendo,* that a pretrial detainee retains a diminished expectation of privacy after commitment to a custodial facility, we nonetheless find that the room-search rule does not violate the Fourth Amendment.

*Id.* at 556–57, 99 S.Ct. at 1883 (citation omitted).

Second, the Court reviewed a prison policy requiring visual body cavity searches conducted on inmates after every contact visit with an outside visitor. In a five to four decision, the Court upheld the search, explaining:

> Admittedly, this practice instinctively gives us the most pause. However, assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility, ... we nonetheless conclude that these searches do not violate that amendment. The Fourth Amendment prohibits only unreasonable searches, ... and under the circumstances, we do not believe that these searches are unreasonable. The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. *In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.* Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted.... A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record .... That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

We do not underestimate the degree to which these searches may invade the personal privacy of inmates. Nor do we doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion.... Such an abuse cannot be condoned. The searches must be conducted in a reasonable manner.... But we deal here with the question whether visual body cavity inspections as contemplated by the MCC rules can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can.

*Id.* at 558–60, 99 S.Ct. at 1884–85 (emphasis added) (citations omitted).

Although the Supreme Court has not defined the extent, if any, to which a prisoner retains his fourth amendment right against unreasonable search or seizure, the Seventh Circuit Court of Appeals has ruled that a prisoner's "surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody." *Bonner v. Coughlin,* 517 F.2d 1311, 1316 (7th Cir.1975) (relying on *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Additionally, the common denominator in the Supreme Court's and the Seventh Circuit's fourth amendment analysis is the need to balance the security interests of the prison against the personal rights of the inmate. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975). It is this weighing of the penal institution's legitimate policies and goals against the constitutional rights retained by the *prisoner* which necessitates curtailing the inmates' constitutional rights. As the Court stated in *Bell v. Wolfish,*

simply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations.... There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

441 U.S. at 545–46, 99 S.Ct. at 1877–78 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)).

Balancing the competing interests of institutional goals and constitutional rights this court concludes that the case at bar differs significantly from *Bell v. Wolfish.* In *Bell v. Wolfish,* the searches were directly related to the legitimate security interests of the prison which outweighed any expectation of privacy by the prisoners. The searches, therefore, were reasonable and did not violate the fourth amendment. Here, however, no legitimate security interest of the prison was advanced by identifying the plaintiff to the camera crew and permitting him to be filmed in his cell without consent.

Added support for an inmate's limited expectation of privacy is found in the rule denying news media a right of access to prisons greater than that of the general public. In *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1977), the United States Supreme Court discussed the media's right of access to penal institutions. The respondents in *Houchins,* including a television broadcasting station, filed an action under 42 U.S.C. § 1983 after they were denied permission to inspect and take pictures of a California jail by the petitioner, who controlled all access to the jail. The Court first noted that, " 'newsmen have no constitutional right of access to prisons or their inmates beyond that afforded to the general public.' " *Id.* at 7, 98 S.Ct. at 2592 (quoting *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974)). The Court recognized that the respondents enjoyed a first amendment right to receive letters from inmates and to interview legal representatives and visitors of the inmates, and noted California statutes providing various means of public access to information regarding the prison. In rejecting the respondents' claim of a first amendment right to interview and film the prisoners, however, the Court held, "until

the political branches decree otherwise ... the media have no special right of access to the ... jail different from or greater than that accorded the public generally." 438 U.S. at 16, 98 S.Ct. at 2597. That being so, the inmate would have a reasonable expectation of privacy from the media's intrusion.

Although *Houchins* involved an alleged first amendment violation by the person controlling access to the prison, rather than an inmate's claim of a violation of his right of privacy, the Court's rationale is nonetheless helpful. Although the media in the present case may enjoy some right to inform the public of conditions at Pontiac, there is nothing in this case to show that this right could not have been exercised in a manner which would not have infringed upon the plaintiff's expectation of privacy.

▇ After balancing the need for the filming and the interests advanced by the filming against the plaintiff's personal privacy interest, the court concludes that the plaintiff's expectation of privacy was legitimate and reasonable.

▇ The fact that the plaintiff's image never actually appeared on a telecast does not warrant summary judgment in favor of the defendant. In considering the defendant's motion for summary judgment, the court must accept as true the plaintiff's contention that he was indeed filmed. Even if those portions of the film containing the plaintiff's image were removed in the editing process, the initial filming of the plaintiff would nonetheless constitute a violation of the plaintiff's legitimate expectation of privacy. The fourth amendment prohibits unreasonable searches. The court, therefore, must focus on the search rather than the result of the search. In the present case, the search occurred when the plaintiff was filmed, not when the film was broadcast. Just as the success of a search in revealing evidence is immaterial in determining the validity of the search, *Byars v. United States,* 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927), the plaintiff's absence from the broadcast is immaterial in determining the reasonableness of the filming.

### B. *Fourteenth Amendment.*

The constitutional right of privacy has been found to emanate also from the fourteenth amendment due process clause. In *Roe v. Wade,* 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973), the Supreme Court concluded that the right of privacy was "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action ...." If a right of privacy arises from the concept of liberty contained in the fourteenth amendment, then it is necessary to decide whether the plaintiff's interest in not being filmed against his wishes was such a protected liberty interest.

▇ The scope of liberty interests sufficient to invoke the procedural protections of the due process clause is not infinite. *Board of Regents v. Roth,* 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The interests considered to be within the fourteenth amendment concept of liberty, however, are many and varied. *See id.* at 571, 92 S.Ct. at 2706 ("'Liberty' and 'property' are broad and majestic terms. They are among the '[g]reat [constitutional] concepts ... purposely left to gather meaning from experience .... [T]hey relate to the whole domain of social and economic fact ....'" (quoting *National Ins. Co. v. Tidewater Co.,* 337 U.S. 582, 646, 69 S.Ct. 1173, 1209, 93 L.Ed. 1556 (Frankfurter, J., dissenting))); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (the liberty contemplated by the fourteenth amendment includes the right "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.") A liberty interest may be created by state statutes. *Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Similarly, a protectible liberty interest may be created by a state prison's administrative regulations. *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982).

Under the rationale enunciated in *Shango,* a prison administrative regulation may give rise to a protectible liberty interest only if substantive restrictions are placed on the discretion of the prison officials in taking the action regulated by the specific administrative regulation. In *Shango,* the plaintiff claimed that the defendants violated his right to due process of law by denying him a hearing prior to an intrastate interprison transfer. In holding that the plaintiff's right to a pretransfer hearing did not constitute a liberty interest invoking the procedural protections of the fourteenth amendment, the Seventh Circuit noted that there were no substantive restrictions on the prison officials' discretion to transfer a prisoner. The court reasoned, "[i]f officials may transfer a prisoner to another prison irrespective of what the inmate may establish at an administrative hearing, the Fourteenth Amendment does not demand that the state engage in a ritualistic hearing." *Id.* at 1101–02.

The administrative regulation in the present case, A.R. 011 II C, establishes the policy of the Pontiac Correctional Center relative to news media access to the inmates and regulates the defendant's right to authorize interviewing or photographing of inmates. Unlike the administrative regulation involved in *Shango,* A.R. 011 II C does place substantive restrictions on the prison officials' discretion in allowing media access to inmates. A.R. 011 II C provides:

> With respect to requests for interviews with residents, it will be necessary for the reporter to first obtain the resident's permission. The resident may wish to consult with his/her attorney of record before agreeing to be interviewed and/or photographed. Before being interviewed or photographed, the resident must sign a Resident Consent Form and same should be witnessed by a department staff member.

Because the administrative regulation requires the inmate's consent prior to his being interviewed or photographed, it places substantive restrictions on the discretion of the prison administrators to authorize media access to the inmates. Under the ra-

tionale established in *Shango,* therefore, the plaintiff may have a protectible liberty interest in not being filmed without his consent. Applying the analysis enunciated in *Roe v. Wade,* the plaintiff would also have an interest based on due process.

Regardless of whether the right of privacy is found to originate in the fourth or the fourteenth amendment, the cited authorities show that the plaintiff enjoyed a privacy interest in not being filmed in his cell by the news media without his consent. Disputed factual questions remain concerning whether the plaintiff was indeed filmed and whether the defendant authorized the filming, and summary judgment is inappropriate.

## II. THE DUE PROCESS ISSUE.

The defendant also contends that no issues of material fact remain as to the plaintiff's denial of due process claim and that summary judgment is appropriate on that issue. The plaintiff's due process claim is based on the defendants' alleged violation of A.R. 011 II C. The same liberty interest analysis discussed with regard to the privacy claim applies to the due process claim. Under *Shango v. Jurich, supra,* A.R. 011 II C creates a liberty interest sufficient to invoke the procedural safeguards of the fourteenth amendment. Moreover, the same unresolved factual questions existing with regard to the privacy claim preclude summary judgment on the due process claim. The pleadings and evidentiary materials do not conclusively show whether Warden Fairman authorized the filming of the plaintiff or whether the plaintiff was actually filmed and summary judgment on the second issue is equally inappropriate.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment be, and hereby is, denied.